[No. B232277. Second Dist., Div. Four. Aug. 1, 2012.]

THE PEOPLE, Plaintiff and Respondent, v.
WALTER FERNANDEZ, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts II., III., and IV. of the Discussion.

## COUNSEL

Steven A. Brody and Gerald Peters, under appointments by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Susan Sullivan Pithey, Shawn McGahey Webb and Louis W. Karlin, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**SUZUKAWA, J.**—A jury convicted defendant Walter Fernandez of second degree robbery (Pen. Code, § 211) (count 1)[1] and willful infliction of corporal injury on a spouse, cohabitant, or child's parent (§ 273.5, subd. (a)) (count 2); as to count 1, the jury further found that (1) in the commission of the offense, the defendant personally used a dangerous and deadly weapon, to wit, a knife, within the meaning of section 12022, subdivision (b)(1); and (2) the offense was committed for the benefit of, at the direction of, or in association with a criminal street gang, within the meaning of section 186.22, subdivision (b)(1). Defendant pled nolo contendere to possession of a firearm by a felon (§ 12021, subd. (a)(1))[2] (count 3), short-barreled shotgun or rifle activity (§ 12020, subd. (a)(1))[3] (count 4), and possession of ammunition (§ 12316, subd. (b)(1))[4] (count 5). The trial court imposed a sentence of 14 years.

In this appeal from the judgment, defendant contends (1) the trial court erred in denying his motion to suppress evidence seized during a warrantless search of his apartment; (2) the trial court abused its discretion by admitting evidence that a suspect was arrested for attempted murder in defendant's apartment; (3) there was insufficient evidence to support the true finding on the gang allegation; and (4) the trial court erred in denying defendant's *Pitchess*[5] motion.

In the published portion of the opinion, we conclude the trial court properly denied defendant's suppression motion. In the unpublished portion,

---

[1] All further statutory references are to the Penal Code.

[2] Section 12021, subdivision (a)(1) was repealed and replaced by section 29800 without substantive change. (Stats. 2010, ch. 711, § 6, operative Jan. 1, 2012.)

[3] Section 12020, subdivision (a)(1) was repealed and replaced by section 33215 without substantive change. (Stats. 2010, ch. 711, § 6, operative Jan. 1, 2012.)

[4] Section 12316, subdivision (b)(1) was repealed and replaced by section 30305 without substantive change. (Stats. 2010, ch. 711, § 6, operative Jan. 1, 2012.)

[5] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 [113 Cal.Rptr. 897, 522 P.2d 305] (*Pitchess*).

we reject defendant's remaining claims, with the exception of his contention of *Pitchess* error. We conditionally reverse the section 273.5, subdivision (a) conviction for the trial court to conduct an in camera review of one officer's personnel file; in all other respects, we affirm the judgment.

## STATEMENT OF FACTS

I. *Prosecution Case*

 A. *Percipient Testimony*

 1. *Abel Lopez*

On October 12, 2009, at about 11:00 a.m., Abel Lopez was approached after cashing a check near the corner of 14th Street and Magnolia in Los Angeles by a man with light skin, a grey sweater, and a tattoo on his bald head. The man, whom Lopez later identified as defendant, asked what neighborhood Lopez was from. Lopez said, "I'm from Mexico." Defendant laughed and said Lopez was in his territory and should give him his money. He then said, "The D.F.S. rules here. They rule here." Defendant took a knife out of his pocket and pointed it towards Lopez's chest. Lopez put up his hands to protect himself and defendant cut Lopez's wrist.

Lopez tried to run away and, while running, took out his cell phone and called 911. He told the 911 operator he needed help because someone wanted to kill him. Defendant then whistled loudly and three or four men ran out of a building on 14th Street and Magnolia. They hit Lopez in the face and all over his body, knocking him to the ground, where they continued to hit and kick him. When he got up, Lopez did not have his cell phone or wallet.[6] He saw the men running back to the building from which they had come. As a result of the attack, Lopez suffered a deep cut on his left wrist and bruising and swelling over his body.

Several minutes after the attack, the police and paramedics arrived. Lopez participated in a field showup, where he identified defendant.

 2. *Detective Clark and Officer Cirrito*

Detective Kelly Clark and Officer Joseph Cirrito responded to a police radio dispatch on October 12, 2009. Because the police dispatcher indicated possible involvement by members of the Drifters gang in an assault with a deadly weapon, Clark and Cirrito drove to an alley near Magnolia and 14th

---

[6] Lopez told police he had approximately $400 in his wallet.

Street where they knew Drifters gathered. As they stood in the alley, two men walked by and one said, "[T]he guy is in the apartment." The speaker appeared very scared and walked away quickly. When he returned, he again said, "He's in there. He's in the apartment." Immediately thereafter, the detectives saw a tall, light-skinned, Hispanic or White male wearing a light blue T-shirt and khaki pants run through the alley and into the house where the witness was pointing. The house had been restructured into multiple apartments and was a known gang location. A minute or so later, the officers heard sounds of screaming and fighting from the apartment building into which the suspect had run.

Clark and Cirrito called for backup and, once additional officers arrived, knocked on the door of the unit from which they had heard screaming. The door was opened by Roxanne Rojas, who was holding a baby and appeared to be crying. Her face was red and she had a big bump on her nose that looked fresh. She had blood on her shirt and hand that appeared to come from a fresh injury. Cirrito asked what happened and she said she had been in a fight. Cirrito then asked if anyone else was inside the apartment, and she said only her son. When Cirrito asked her to step outside so he could conduct a sweep of the apartment, defendant stepped forward. He was dressed only in boxer shorts and seemed very agitated. He said, "You don't have any right to come in here. I know my rights." Cirrito removed him from the residence and took him into custody.

While Cirrito and Clark arrested defendant at the rear of the house, two men ran out of the front of the house. Officers detained them for questioning.

After defendant was removed from the scene, officers secured the apartment. Clark then went back to Rojas, told her that defendant had been identified as a robbery suspect, and asked for Rojas's consent to search the apartment. Rojas gave consent, orally and in writing. During the ensuing search, officers found Drifters gang paraphernalia, a butterfly knife, boxing gloves, and clothing, including black pants and a light blue shirt. None of the items stolen from the victim was ever found.

The officers interviewed Rojas about her injuries. She said that when defendant entered the apartment, she confronted him about his relationship with a woman named Vanessa. They argued, and defendant struck Rojas in the face. The officers also spoke to Rojas's four-year-old son, Christian, who told them defendant had a gun. Officers recovered a sawed-off shotgun from a heating unit where Christian told them it was hidden.

Two days later, Cirrito interviewed Rojas again. She said several times that she did not want to be a "rat" and that defendant would be very upset if he

knew she was talking to the police. She denied that defendant struck her and said she had been struck in the face by Vanessa.

### B. *Expert Testimony*

#### 1. *Defendant's Active Gang Membership*

Cirrito testified for the prosecution as a gang expert, opining that defendant was an active member of the Drifters, a Latino street gang. He said that the Drifters began as a "car club," but moved into criminal activities in the 1980's. By the 1990's, they began to engage in more violent crimes, such as assaults, carjackings, attempted murders, and narcotics sales. As of October 2009, there were about 140 active Drifters members. In 2009, defendant told officers he had been a member of the Drifters (12th Street Bagos clique) for nine years.

The Drifters's territory includes a "stronghold" in the area between 14th Street and 15th Street, and between Hoover and Menlo. The stronghold is an area where gang members can retreat if there is danger, and from which members can escape through secret passageways.

Cirrito testified that defendant had at least four tattoos that indicated his affiliation with the Drifters: "D.F.S.," an abbreviation for Drifters, was tattooed on his leg; "Drifters" was tattooed on his back; "L.A." was tattooed on his chest; and a gas mask and fedora were tattooed on his back. According to Cirrito, "[N]ot everyone that gets an 'L.A.' on there is a gang member, but there is a trend that gang members, especially the Latino gangs[,] will use that L.A. logo. It represents L.A. where they take a lot of pride [in] where they're from." Cirrito also testified that the gas mask and fedora represent an underground rap group called Psychoheads, which "talk[] a lot about weed, smoking weed and so on. It's an underground group, but they're very popular with the neighborhood gangsters. A lot of gang members will put that on because, again, it's—we talk about reputation and pride in the area. Psycho- heads came from the Pico Union area, which is close by that particular area of the Drifters."

Cirrito testified that a "moniker" is a nickname typically given to a gang member. Defendant's moniker is "Blocks." The moniker "Blocks" appeared in a Drifters "roll call" (list of active gang members) on a water heater near defendant's apartment. "Blocks" also appeared in tagging on a garage door a few days after defendant's arrest, which read "D.F.S. [(Drifters)], Bagos, Block[s]." "Bagos" is the Drifters clique in the area in which defendant lives.

Cirrito testified that an art book recovered from defendant's bedroom on October 12, 2009, also evidences defendant's gang membership. Specifically,

he noted that the book contains a roll call with monikers and references to "D.F.S. 13," "D.F.S. 12th Street, Bagos," "Blocks," "Rox," "Roxy, 12th Street," "Drifters," and "Drifters 13." Cirrito said that "13" indicates an affiliation with the Mexican mafia, the "M.A."

Cirrito testified that baseball caps were also recovered from defendant's living room following his arrest; one cap was brown, with "L.A." and "Drifters" written inside, and another was blue and embroidered with the name "Trigger," a documented Drifters member.

In summary, Cirrito opined that defendant was an active member of the Drifters because he had tattoos that reference the Drifters gang; he goes by the moniker "Blocks"; he admitted to officers that he has been a member of the Drifters; he had gang paraphernalia in his home; he lived in a Drifters stronghold; and during the incident for which he was arrested, he said, "Where are you from? D.F.S. rules here."

### 2. *Cirrito's Opinion That the Robbery Was Gang Related*

Cirrito testified that gang members care deeply about their gang's reputation in the community because "reputation means everything to them." He said that gangs want respect from rival gangs, but they also want to terrorize the neighborhoods in which they operate so people will be afraid to come forward and talk about the gang's criminal activities. A gang makes itself known in the community in several ways, primarily by committing crimes and tagging.

The Drifters establish their territory "[b]y committing crimes in—just open daylight. There's fear and intimidation . . . . [S]ome of these younger people . . . want to be gang members. Some of them, it's almost peer pressure. Some of them are actually forced because they live in that neighborhood. They get beat up. They're getting—I'll say attacked or pocket checked, and, eventually, they give in to just be part of this gang."

Cirrito opined that Drifters members individually and collectively engage in a pattern of criminal gang activity. Their primary activities are robbery, grand theft auto, assault with a deadly weapon, narcotics, and attempted murder.

The prosecutor asked Cirrito the following hypothetical: "I want you to assume that the location we're talking about is 14th and Magnolia, that it is twelve o'clock in the day, broad daylight for other people to see and that you have an individual who had recently been to a check cashing location or a similar location. He is leaving his girlfriend's house in that area, 14th and

Magnolia. He's alone. He is approached by someone with a distinctive tattoo on the top of their head who is taller than that individual, that that person comes up to the man who is alone and asks that person, 'Where are you from?' That the person says—we'll call the smaller person the victim. He says, 'I'm not from anywhere. I'm from Mexico,' that the suspect says 'Drifters rule here,' in Spanish. 'This is Drifters, D.F.S.,' something to that effect multiple times, and the location is 14th and Magnolia. The suspect then demands the wallet of the victim and takes out a knife, points the knife at the victim, and the victim, in an attempt to defend himself, puts [his] wrist in front of [his] body, and the knife actually punctures through the sweater into the wrist of the victim. The victim starts to run, at which point the suspect then whistles, and three to four additional presumably other gang members come to attack the victim. The victim calls 911 and is subsequently punched, kicked, beaten and has his wallet stolen, his Mexican ID is stolen, his cell phone is stolen, and the cash that he had recently cashed at the check cashing is taken. He sees the suspect with the knife and the tattoo along with the three to four others, then all flee, and he participates in a field showup and is able to identify the person with the tattoo, the person with the knife. His property is never recovered. Under that set of circumstances, would you believe, Officer, based on your background, training and experience, that that hypothetical, whether the act, the robbery itself, would be committed for the benefit of or at the direction of or in association with a criminal street gang, assuming that that particular location, 14th and Magnolia, was the stronghold of that gang with the specific intent to promote, further or assist in criminal conduct by gang members?"

Cirrito opined that, for the following reasons, he believed the hypothetical crime to be gang related: "It almost falls under the definition of what a gang is. A gang has three or more people who formally or informally have a common name, sign[,] or symbol[,] who engage or have engaged individually or collectively in a crime that causes fear and intimidation within a community, and . . . one of the crimes under this definition of 186.22 is a robbery. And the fact that it was done in broad daylight in this gang location, it's very bold to do that in daylight. You must feel—that individual must feel that he has a lot of power in that community. That person must feel that . . . no one is going to rat me out. No one's going to tell them who I was. The idea that he whistles others, that it was premeditated, that they're waiting, they have this all set up, and that these three other individuals or four individuals assist this one individual in taking property of one person. To even go back on that, when that person walks up on this person and says, 'Where are you from?' For most citizens who live in this area, when they hear that, they know I'm getting banged on. He's asking me where I'm from. If you think about it, an individual—anybody that approaches you and you don't know who they are and they engage in a conversation, you get a little defensive like what does

this person want? Now, he's telling you 'Drifters rule here.' I'm basically now thinking—well, this person is thinking I'm either going to get robbed; I'm going to get jumped; beat up. I might even be killed because this guy's a gang member, and it's not just him that I have to fight. It's all—it's the gang. He's telling me he's from a gang, Drifters, for example. So in my opinion, this is for the benefit of a gang. The robbery itself—the cell phones could be used. They could change out the SIM card. They could be used for narcotics sales. They could be pawned off for a few bucks. The Mexican ID could be used to—for someone that doesn't have ID. They could change it. It could be used for fraud, identity theft. The $400 could be used for buying more narcotics. It could be for buying guns, weapons. It could be paying for books for people who have recently been incarcerated and are in jail and that they need books for phone calls and cigarettes and anything else that they need. So my feeling is that this crime was done for the benefit of a gang."

## II. *Defense Case*

Roxanne Rojas testified that on October 12, 2009, she and defendant were living together in the apartment where defendant was arrested. About 11:00 a.m., defendant left the apartment to buy tacos and cigarettes; Rojas remained home with their two-month-old daughter and four-year-old son. While defendant was gone, a woman named Vanessa came to the apartment, and she and Rojas fought. Rojas and Vanessa were both injured during the fight. When defendant returned to the apartment through the back door, Vanessa left out the front door. Defendant saw that Rojas was injured and began to yell at her. Moments later, an officer arrived. The officer asked Rojas to let him in, and Rojas "didn't say yes. I didn't say no. I said let me get my children." Rojas agreed that defendant has a Drifters tattoo, but said he was no longer active in the gang.

Defendant testified that he had been involved with the Drifters earlier in his life. He was "forcibly jumped in" when he was 18 or 19 years old and he "had to basically like go with the flow." He was never heavily involved with the Drifters; "[i]t always was just about like simply like me living there . . . like I'm out there doing stuff in the neighborhood . . . hanging out with people I grew up with." He admitted that he had been convicted of receiving stolen property and served time in prison. He said he was released in 2007 and turned his life around. He began working and got an apartment in Marina del Rey for himself, Rojas, and her son. When Rojas got pregnant with her second child, the family moved to a two-bedroom apartment on 15th Street and Magnolia, but he had nothing to do with the Drifters.

Defendant testified that on the morning of October 12, 2009, he woke up late, played with his son, and then went out to get tacos for the family. On

14th Street, he was approached by a Hispanic man who appeared to be drunk. The man said, "Crazy Riders," which is a rival gang from the area. Defendant ignored him and kept walking. The man continued to talk to him and then "got into the point where he's coming at me." Defendant pushed him away, and the two men got into a fistfight. When it was over, defendant continued to the liquor store to buy cigarettes and then went home. Defendant never saw the man again. When he returned home, Rojas told him a girl had come to the house looking for him, and she and the girl had gotten into a fight. Defendant was upset that Rojas had let the girl in, and he and Rojas began yelling at one another. He did not hit Rojas during the argument. The police arrived a few minutes later and arrested him.

On cross-examination, defendant conceded that he has four prior felony convictions for theft-related crimes. He said "Blocks" or "Blockhead" is his nickname, but it is not a gang moniker.

III. *Sentencing and Appeal*

On October 8, 2010, defendant pled nolo contendere to counts 3, 4, and 5 (firearms and ammunition possession). In connection with defendant's plea, the parties agreed that defendant's son would not be called as a witness in the jury trial and the prosecution would not reference a gun seized at defendant's home after his arrest. On October 25, 2010, the jury convicted defendant of counts 1 and 2 (second degree robbery and corporal injury on a spouse, cohabitant, or child's parent); as to count 1, the jury further found that (1) in the commission of the offense, defendant had personally used a dangerous and deadly weapon, and (2) the offense was committed for the benefit of, at the direction of, or in association with a criminal street gang.

As to count 1, the court sentenced defendant to 14 years (midterm of three years, plus an additional consecutive term of 10 years pursuant to § 186.22, subd. (b)(1)(A), plus an additional term of one year pursuant to § 12022, subd. (b)(1)). As to count 2, the court sentenced defendant to the midterm of three years, to run concurrent with the principal term. As to counts 3, 4, and 5, the court sentenced defendant to the midterm of two years, to run concurrent with the principal term.

Defendant timely appealed.

## DISCUSSION

Defendant contends (1) the trial court erred by denying his motion to suppress evidence seized in his apartment during a warrantless search; (2) the trial court abused its discretion by admitting evidence that a suspect was

arrested for attempted murder in defendant's apartment; (3) there was insufficient evidence to support the true finding on the gang allegation; and (4) the trial court erred by denying defendant's *Pitchess* motion. We consider these issues below.

## I. The Trial Court Did Not Err by Denying Defendant's Motion to Suppress

Prior to trial, defendant filed a motion pursuant to section 1538.5 to suppress evidence seized during a warrantless search of his apartment following his arrest. Specifically, defendant sought to exclude (1) a Mossberg New Haven 20-gauge shotgun, (2) Remington 20-gauge shotgun ammunition, (3) a knife with a four-and-one-half-inch stainless steel blade, (4) any currency seized during the search, and (5) any other evidence seized, including clothing, notebooks, and boxing gloves. The trial court denied the motion to suppress. We review the order de novo to determine whether, on the facts found by the trial court on the basis of substantial evidence, the search or seizure was reasonable under the Fourth Amendment. (*People v. Duncan* (2008) 160 Cal.App.4th 1014, 1017 [73 Cal.Rptr.3d 264].)

Defendant contends that the trial court erred by denying the motion to suppress, noting that the officers did not obtain a search warrant and he objected to their entry into his apartment. Citing *Georgia v. Randolph* (2006) 547 U.S. 103, 114 [164 L.Ed.2d 208, 126 S.Ct. 1515] (*Randolph*), and *U.S. v. Murphy* (9th Cir. 2008) 516 F.3d 1117 (*Murphy*), he urges that Rojas's subsequent consent to a search of their apartment was invalid and any evidence obtained was inadmissible. The Attorney General disagrees, contending that Rojas's consent provided a constitutionally permissible basis for the search once defendant was lawfully removed from the apartment.

We begin by discussing *Randolph*, in which the United States Supreme Court held that police officers may not constitutionally conduct a warrantless search of a home over the express refusal of consent by a physically present resident, even if another resident consents to a search. We then discuss the split of authority among the federal circuit courts as to *Randolph*'s application to a case like the present one, where consent to search is given by a defendant's cotenant after the defendant is arrested and removed from the residence. We conclude that under the circumstances of the present case, the search was lawful.

### A. Georgia v. Randolph

In *Randolph, supra,* 547 U.S. 103, defendant's wife, Janet Randolph, called police to the family home and complained that her husband was a

cocaine user. An officer asked the defendant's permission to search the house; he refused. The officer then sought Mrs. Randolph's consent to search, which she gave. In the defendant's bedroom, the officer discovered cocaine and drug paraphernalia. (*Id.* at p. 107.)

The defendant moved to suppress the evidence as products of a warrantless search. (*Randolph, supra,* 547 U.S. at p. 107.) The Supreme Court granted certiorari "to resolve a split of authority on whether one occupant may give law enforcement effective consent to search shared premises, as against a co-tenant who is present and states a refusal to permit the search." (*Id.* at p. 108.)

█ The court noted that to the Fourth Amendment rule ordinarily prohibiting the warrantless entry of a person's house as unreasonable per se, "one 'jealously and carefully drawn' exception, *Jones* v. *United States,* 357 U.S. 493, 499 [2 L.Ed.2d 1514, 78 S.Ct. 1253] (1958), recognizes the validity of searches with the voluntary consent of an individual possessing authority, [*Illinois v.*] *Rodriguez,* 497 U.S. [177,] 181 [111 L.Ed.2d 148, 110 S.Ct. 2793] [(1990)]. That person might be the householder against whom evidence is sought, *Schneckloth* v. *Bustamonte,* 412 U.S. 218, 222 [36 L.Ed.2d 854, 93 S.Ct. 2041] (1973), or a fellow occupant who shares common authority over property, when the suspect is absent, [*United States v.*] *Matlock,* [415 U.S. 164,] 170 [39 L.Ed.2d 242, 94 S.Ct. 988] [(1974)]." (*Randolph, supra,* 547 U.S. at p. 109.) The exception recognized in those cases " 'does not rest upon the law of property, with its attendant historical and legal refinements, but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.' " (*Id.* at p. 110.)[7]

█ The "constant element" in assessing Fourth Amendment reasonableness in the consent cases, the Supreme Court explained, is "the great significance given to widely shared social expectations, which are naturally

---

[7] In *Illinois v. Rodriguez, supra,* 497 U.S. at pages 179–180 (*Rodriguez*), the defendant's girlfriend consented to an officer's entry into the apartment she and the defendant shared, where the defendant was then sleeping. The Supreme Court held that evidence seized during the warrantless search of the apartment could be introduced against the defendant because the authorities reasonably believed his girlfriend had the authority to consent. (*Id.* at p. 189.) In *United States v. Matlock, supra,* 415 U.S. 164, 166, 177 (*Matlock*), the court held that evidence seized during a warrantless search of the defendant's bedroom could be admitted against him because his girlfriend consented to the search; the defendant's consent was neither sought nor obtained, although he was at the time of the search in police custody in the front yard of the home.

enough influenced by the law of property, but not controlled by its rules. [Citation.] *Matlock* accordingly not only holds that a solitary co-inhabitant may sometimes consent to a search of shared premises, but stands for the proposition that the reasonableness of such a search is in significant part a function of commonly held understanding about the authority that co-inhabitants may exercise in ways that affect each other's interests." (*Randolph, supra,* 547 U.S. at p. 111.) Such an understanding includes an assumption tenants "usually make about their common authority when they share quarters. They understand that any one of them may admit visitors, with the consequence that a guest obnoxious to one may nevertheless be admitted in his absence by another. As *Matlock* put it, shared tenancy is understood to include an 'assumption of risk,' on which police officers are entitled to rely . . . ." (*Ibid.*)

 The situation differs, however, when a cohabitant is present and denying entrance: "[I]t is fair to say that a caller standing at the door of shared premises would have no confidence that one occupant's invitation was a sufficiently good reason to enter when a fellow tenant stood there saying, 'stay out.' Without some very good reason, no sensible person would go inside under those conditions. . . . [¶] The visitor's reticence without some such good reason would show not timidity but a realization that when people living together disagree over the use of their common quarters, a resolution must come through voluntary accommodation, not by appeals to authority." (*Randolph, supra,* 547 U.S. at pp. 113–114.) "In sum, there is no common understanding that one co-tenant generally has a right or authority to prevail over the express wishes of another, whether the issue is the color of the curtains or invitations to outsiders." (*Id.* at p. 114.)

Applying these principles, the court concluded that "[s]ince the co-tenant wishing to open the door to a third party has no recognized authority in law or social practice to prevail over a present and objecting co-tenant, his disputed invitation, without more, gives a police officer no better claim to reasonableness in entering than the officer would have in the absence of any consent at all." (*Randolph, supra,* 547 U.S. at p. 114.) It held that "a warrantless search of a shared dwelling for evidence over the express refusal of consent by a *physically present resident* cannot be justified as reasonable as to him on the basis of consent given to the police by another resident." (*Id.* at p. 120, italics added.)

 The court then reaffirmed the continuing vitality of *Matlock* and *Rodriguez,* explaining as follows: "Although the *Matlock* defendant was not present with the opportunity to object, he was in a squad car not far away; the *Rodriguez* defendant was actually asleep in the apartment, and the police might have roused him with a knock on the door before they entered with

only the consent of an apparent co-tenant. If those cases are not to be undercut by today's holding, we have to admit that we are drawing a fine line; if a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, nearby but not invited to take part in the threshold colloquy, loses out.

"This is the line we draw, and we think the formalism is justified. So long as there is no evidence that the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection, there is practical value in the simple clarity of complementary rules, one recognizing the co-tenant's permission when there is no fellow occupant on hand, the other according dispositive weight to the fellow occupant's contrary indication when he expresses it. For the very reason that *Rodriguez* held it would be unjustifiably impractical to require the police to take affirmative steps to confirm the actual authority of a consenting individual whose authority was apparent, we think it would needlessly limit the capacity of the police to respond to ostensibly legitimate opportunities in the field if we were to hold that reasonableness required the police to take affirmative steps to find a potentially objecting co-tenant before acting on the permission they had already received. There is no ready reason to believe that efforts to invite a refusal would make a difference in many cases, whereas every co-tenant consent case would turn into a test about the adequacy of the police's efforts to consult with a potential objector. Better to accept the formalism of distinguishing *Matlock* from this case than to impose a requirement, time consuming in the field and in the courtroom, with no apparent systemic justification. The pragmatic decision to accept the simplicity of this line is, moreover, supported by the substantial number of instances in which suspects who are asked for permission to search actually consent, albeit imprudently, a fact that undercuts any argument that the police should try to locate a suspected inhabitant because his denial of consent would be a foregone conclusion." (*Randolph, supra*, 547 U.S. at pp. 121–122, fn. omitted.)

The case before it, the court concluded, "invites a straightforward application of the rule that a physically present inhabitant's express refusal of consent to a police search is dispositive as to him, regardless of the consent of a fellow occupant. Scott Randolph's refusal is clear, and nothing in the record justifies the search on grounds independent of Janet Randolph's consent. The State does not argue that she gave any indication to the police of a need for protection inside the house that might have justified entry into the portion of the premises where the police found the powdery straw (which, if lawfully seized, could have been used when attempting to establish probable cause for the warrant issued later). Nor does the State claim that the entry and search should be upheld under the rubric of exigent circumstances, owing to some apprehension by the police officers that Scott Randolph would destroy

evidence of drug use before any warrant could be obtained." (*Randolph, supra*, 547 U.S. at pp. 122–123.)

B. *U.S. v. Murphy*

In *Murphy, supra*, 516 F.3d 1117, the Ninth Circuit extended *Randolph* to hold that if a defendant expressly withholds consent to search, a warrantless search conducted *after* the defendant has left or been removed from the residence is invalid even if a cotenant subsequently consents. In *Murphy*, the defendant was living in a storage unit rented by Dennis Roper. Officers arrested the defendant, who refused to consent to a search of the storage unit; later, they arrested Roper, who consented to a search. During the search, officers seized a methamphetamine lab.

The defendant challenged the validity of Roper's consent to the search. (*Murphy, supra*, 516 F.3d at pp. 1119–1120.) The Ninth Circuit held that the search violated the Fourth Amendment, rejecting the government's contention that the present case was distinguishable from *Randolph* because the defendant was not present when Roper consented to the search. It explained: "The . . . distinction that the government attempts to make between this case and *Randolph* is that in the former, unlike in the latter, the objecting co-tenant was not physically present when the other tenant gave consent to the search. Here, Murphy refused consent and was subsequently arrested and removed from the scene. Two hours later, officers located Roper and obtained consent from him to search the units. Roper did not know that Murphy had previously refused consent and Murphy was not present to object once again to the second search. We see no reason, however, why Murphy's arrest should vitiate the objection he had already registered to the search. We hold that when a co-tenant objects to a search and another party with common authority subsequently gives consent to that search in the absence of the first co-tenant the search is invalid as to the objecting co-tenant.

"We find support for our holding in the *Randolph* Court's treatment of the related issue of police removal of a tenant from the scene for the purpose of *preventing* him from objecting to a search. [Citation.] The Court held that third party consent to a search is valid only '[s]o long as there is no evidence that the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection.' [Citation.] If the police cannot prevent a co-tenant from objecting to a search through arrest, surely they cannot arrest a co-tenant and then seek to ignore an objection he has already made. Nor, more generally, do we see any reason to limit the *Randolph* rule to an objecting tenant's removal by police. Once a co-tenant has registered his objection, his refusal to grant consent remains effective barring some objective manifestation that he has changed his position and no

longer objects. The rule that *Randolph* establishes is that when one co-tenant objects and the other consents, a valid search may occur only with respect to the consenting tenant. It is true that the consent of either co-tenant may be sufficient in the absence of an objection by the other, either because he simply fails to object or because he is not present to do so. Nevertheless, when an objection has been made by either tenant prior to the officers' entry, the search is not valid as to him and no evidence seized may be used against him. Rather, as in this case, in the absence of exigent circumstances, the police must obtain a warrant before conducting the search." (*Murphy, supra,* 516 F.3d at pp. 1124–1125, fn. omitted.)

### C. *Subsequent Case Law*

Four federal circuit courts and at least two state Supreme Courts have rejected the Ninth Circuit's analysis in *Murphy*; they hold that even if a defendant expressly refuses to allow officers to search his residence, a cohabitant's consent given after a defendant leaves or is lawfully removed will support a warrantless search. *U.S. v. Hudspeth* (8th Cir. 2008) 518 F.3d 954 (*Hudspeth*) is one such case. There, officers executed a search warrant at the defendant's workplace and discovered child pornography on the defendant's computer. The defendant was arrested for possession of child pornography. The arresting officer asked the defendant for permission to search his home computer; he refused. Law enforcement officers then went to the defendant's home, where his wife gave permission to seize the home computer. On that computer, investigators found additional child pornography. (*Id.* at pp. 955–956.) The defendant was indicted for possession of child pornography and pled guilty after unsuccessfully moving to suppress the evidence seized during the searches of his work and home computers. (*Id.* at p. 956.)

As relevant here, the Eighth Circuit held that the warrantless search of the defendant's home computer did not violate the Fourth Amendment. It explained as follows: "The legal issue of whether an officer's knowledge of the prior express refusal by one co-tenant negates the later obtained consent of another authorized co-tenant is a matter of first impression in this court. We will answer this compound legal question by answering the separate legal questions involved.

"First, we know Mrs. Hudspeth was a co-tenant authorized to give the officers consent to search. [Citation.] . . .

"Second, unlike *Randolph*, the officers in the present case were not confronted with a 'social custom' dilemma, where two physically present co-tenants have contemporaneous competing interests and one consents to a search,

while the other objects. Instead, when Cpl. Nash asked for Mrs. Hudspeth's consent, Hudspeth was not present because he had been lawfully arrested and jailed based on evidence obtained wholly apart from the evidence sought on the home computer. Thus, this rationale for the narrow holding of *Randolph*, which repeatedly referenced the defendant's physical presence *and* immediate objection, is inapplicable here. [¶] . . . [¶]

"The *Randolph* opinion repeatedly referred to an 'express refusal of consent by a *physically present* resident.' *Randolph*[, *supra*], 547 U.S. at [p.] 120 [126 S.Ct. 1515] (emphasis added); *e.g., id.* at [pp.] 108, 109, 114, 121–23 [126 S.Ct. 1515]. The *Randolph* majority candidly admitted 'we are drawing a fine line; if a potential defendant with self-interest in objecting is in fact *at the door and objects*, the co-tenant's permission does not suffice for a reasonable search.' *Id.* at [p.] 121 [126 S.Ct. 1515] (emphasis added). Hudspeth was not at the door and objecting and does not fall within *Randolph's* 'fine line.' . . .

■ "The Fourth Amendment does not prohibit warrantless searches and seizures, nor does the Fourth Amendment always prohibit warrantless searches and seizures when the defendant previously objected to the search and seizure. 'What [Hudspeth] is assured by the Fourth Amendment itself, however, is . . . no such search will occur that is "unreasonable." ' *Rodriguez*[, *supra*], 497 U.S. at [p.] 183 [110 S.Ct. 2793]. As the Supreme Court explains, 'it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his [or her] own right.' *Matlock*[, *supra*], 415 U.S. at [p.] 171 n. 7 [94 S.Ct. 988]. And the absent, expressly objecting co-inhabitant has 'assumed the risk' that another co-inhabitant 'might permit the common area to be searched.' *Id.* The authorized co-tenant may give consent for several reasons including an unawareness of contraband on the premises, or a desire to protect oneself or others (as here, Mrs. Hudspeth, in the self-interest of herself and her children, consented to the seizure of the home computer to prevent the placement of an armed, uniformed law enforcement officer in her home to guard the evidence while a search warrant was obtained).

"Under the totality of circumstances of the present case, maintaining the Fourth Amendment's touchstone requirement against unreasonable searches and seizures, we conclude the seizure of Hudspeth's home computer was reasonable and the Fourth Amendment was not violated when the officers sought Mrs. Hudspeth's consent despite having received Hudspeth's previous refusal. We affirm the district court's denial of Hudspeth's motion to suppress the evidence obtained from the warrantless seizure of Hudspeth's home computer." (*Hudspeth, supra,* 518 F.3d at pp. 960–961.)

The Seventh Circuit followed *Hudspeth* (and declined to follow *Murphy*) in *U.S. v. Henderson* (7th Cir. 2008) 536 F.3d 776 (*Henderson*). There, police

were called to the home of the defendant and his wife, Patricia, to investigate a report of domestic abuse. Patricia admitted police into the home, where in "unequivocal terms" the defendant ordered them out.[8] (536 F.3d at p. 777.) The officers arrested the defendant for domestic battery and took him to jail. After his arrest and removal from the scene, Patricia signed a consent-to-search form and led the police on a search that uncovered firearms, crack cocaine, and items indicative of drug dealing. The defendant was indicted on federal weapon and drug charges.

The defendant moved to suppress the evidence recovered from his home, arguing that the search was unreasonable under the Fourth Amendment based on the Supreme Court's decision in *Randolph*. (*Henderson, supra*, 536 F.3d at p. 777.) The Seventh Circuit disagreed: "Henderson argues that his objection remained in force to override Patricia's subsequent consent. He, like the Ninth Circuit, interprets *Randolph* as not confined to its circumstances, that is, as *not* limited to a disputed consent by two contemporaneously present residents with authority. On this broader reading of *Randolph*, a one-time objection by one is sufficient to permanently disable the other from *ever* validly consenting to a search of their shared premises. We think this extends *Randolph* too far. *Randolph* itself, we observed in [*U.S. v.*] *Groves*, [530 F.3d 506 (7th Cir. 2008)], 'expressly disinvites' any reading broader than its specific facts.

■ "Like the Eighth Circuit, we see the contemporaneous presence of the objecting and consenting cotenants as indispensable to the decision in *Randolph*. Indeed, the fact of a conflict between present co-occupants plays a vital role in the *Randolph* majority's 'social expectations' premise; a third party, attuned to societal customs regarding shared premises, would not, '[w]ithout some very good reason,' enter when faced with a disputed invitation between cotenants. *Randolph*[, *supra*], 547 U.S. at [p.] 113 [126 S.Ct. 1515]. The calculus shifts, however, when the tenant seeking to deny entry is no longer present. His objection loses its force because he is not there to enforce it, or perhaps (if we understand the Court's rationale correctly) because the affront to his authority to assert or waive his privacy interest is no longer an issue. As between two present but disagreeing residents with authority, the tie goes to the objector; police may not search based on the consent of one in the face of 'a physically present inhabitant's express refusal of consent' to search. *Id.* at [p.] 122 [126 S.Ct. 1515]. We do not read *Randolph* as vesting the objector with an absolute veto; nothing in the majority opinion suggests the Court was creating a rule of continuing objection." (*Henderson, supra*, 536 F.3d at pp. 783–784.)

---

[8] According to the court: "After a brief exchange, Henderson told the officers to '[g]et the [expletive] out of my house'—which the district court reasonably construed as an objection to a search." (*Henderson, supra*, 536 F.3d at pp. 777–778.)

"Neither the Eighth nor the Ninth Circuit considered the limiting effect of Justice Breyer's concurrence on the scope of the majority opinion. As we have noted, Justice Breyer joined the other four members of the majority with the understanding that the Court's opinion was 'case specific' and 'does not apply where the objector is not present and objecting.' [*Randolph, supra*, 547 U.S.] at [pp.] 126–[1]27 [126 S.Ct. 1515] (Breyer, J., concurring) (internal quotation marks omitted). That, and the specific limiting language in the majority opinion itself, convince us that *Randolph's* holding ought not be extended beyond the circumstances at issue there. *See id.* at [p.] 106 [126 S.Ct. 1515] ('We hold that, *in the circumstances here at issue*, a *physically present* co-occupant's stated refusal to permit entry prevails, rendering the warrantless search unreasonable and invalid as to him.') (emphasis added).

"The Ninth Circuit's decision in *Murphy* essentially reads the presence requirement out of *Randolph*, expanding its holding beyond its express terms and giving rise to many questions with no readily identifiable principles to turn to for answers. If an objecting co-occupant's presence is not required, are there any limits to the superiority or duration of his objection? What circumstances (if any) operate to reinstate a co-occupant's authority to consent to a search? May an occupant arrested or interviewed away from the home preemptively object to a police request to search and effectively disable his co-occupants from consenting even in his absence? *Murphy's* answer— that the objecting occupant's objection is binding until he, and only he, objectively manifests his consent to a search—ignores *Randolph's* social-expectations foundation. A prior objection by an occupant who is no longer present would not be enough to deter a sensible third party from accepting an invitation to enter by a co-occupant who is present with authority to extend the invitation. Under these circumstances even an initially reluctant guest would feel confident he was not breaking any unwritten social rules by entering. Just as a tenant's mere[ ]presence is not enough to override his cotenant's consent, *see Rodriguez*[, *supra*], 497 U.S. at [p.] 177 [110 S.Ct. 2793] (tenant asleep in the next room), so too his objection is not enough if he is absent from the later entry by authorities with the voluntary consent of his cotenant. [¶] . . . [¶]

■ "Our conclusion, like the Eighth Circuit's, implements *Randolph's* limiting language and the Court's stated intent to maintain the vitality of *Matlock* and *Rodriguez*. Absent exigent circumstances, a warrantless search of a home based on a cotenant's consent is unreasonable in the face of a present tenant's express objection. Once the tenant leaves, however, social expectations shift, and the tenant assumes the risk that a cotenant may allow the police to enter even knowing that the tenant would object or continue to object if present. Both presence *and* objection by the tenant are required to render a consent search unreasonable as to him.

"Here, it is undisputed that Henderson objected to the presence of the police in his home. Once he was validly arrested for domestic battery and taken to jail, however, his objection lost its force, and Patricia was free to authorize a search of the home. This she readily did. Patricia's consent rendered the warrantless search reasonable under the Fourth Amendment, and the evidence need not have been suppressed. (Fn. omitted.)" (*Henderson, supra*, 536 F.3d at pp. 784–785.)

At least two other federal circuit courts and two state Supreme Courts have followed *Hudspeth* and *Henderson* and declined to follow *Murphy*. (See *U.S. v. Shrader* (4th Cir. 2012) 675 F.3d 300, 307; *U.S. v. Cooke* (5th Cir. 2012) 674 F.3d 491, 499; *People v. Strimple* (Colo. 2012) 267 P.3d 1219, 1221–1226; *State v. St. Martin* (2011) 334 Wis.2d 290, 306–310 [800 N.W.2d 858].)

### D. *Analysis*

We conclude that *Randolph* does not require exclusion of the evidence obtained in the warrantless search of defendant's home. We begin by noting that, like the federal appellate cases discussed above, the facts here differ in a critical way from those of *Randolph*. While the defendant in *Randolph* was present and continued to object to a search of his home, in the present case defendant had been arrested and removed from the apartment before Rojas consented to a search. Thus, unlike in *Randolph*, there was in this case no cotenant "*who is present* and states a refusal to permit the search." (*Randolph, supra*, 547 U.S. at p. 108, italics added.)

Defendant's absence from the home when Rojas consented to a search of the apartment is, we believe, determinative. *Randolph* did not overturn prior cases holding that a coinhabitant may give effective consent to search a shared residence; to the contrary, the *Randolph* court explicitly affirmed the vitality of those cases. (*Randolph, supra*, 547 U.S. at p. 121.) It did so, moreover, even though it noted that the defendants in both *Matlock* and *Rodriguez* were nearby when each cotenant's consent was secured—indeed, the *Rodriguez* defendant was asleep inside the apartment—and thus could have been asked to consent as well. In other words, the *Randolph* court distinguished between cases in which a defendant *was present and objected* to a search, on the one hand, and cases in which a defendant was *not present* and therefore could not object to a search, on the other. The court recognized that it was "drawing a fine line," but believed its formalism was justified so long as there was no evidence that police had removed a potentially objecting tenant from the scene for the sake of avoiding a possible objection. (*Ibid.*)

We believe that the line we draw is consistent with that drawn by the Supreme Court in *Randolph*. As in *Randolph*, the line we draw is a clear one,

distinguishing between cases in which a defendant is present and objecting to a search, and those in which a defendant has been lawfully arrested and thus is no longer present when a cotenant consents to a search of a shared residence. It thus preserves the "simple clarity of complementary rules" established by *Randolph*. (*Randolph, supra*, 547 U.S. at p. 121.)

Further, our rule preserves the law enforcement prerogatives recognized by *Randolph*. As we have said, *Randolph* expressly reaffirmed the holdings of *Matlock* and *Rodriguez*, noting that "it would needlessly limit the capacity of the police to respond to ostensibly legitimate opportunities in the field if we were to hold that reasonableness required the police to take affirmative steps to find a potentially objecting co-tenant before acting on the permission they had already received." (*Randolph, supra*, 547 U.S. at p. 122.) We believe that requiring officers who have already secured the consent of a defendant's cotenant to also secure the consent of an absent defendant would similarly and needlessly limit the capacity of law enforcement to respond to "ostensibly legitimate opportunities in the field." (*Ibid.*)

We note, as the Seventh Circuit did in *Henderson*, that the rule advocated by defendant and adopted by the Ninth Circuit in *Murphy* permits "a one-time objection" by one cotenant to "permanently disable the other [cotenant] from *ever* validly consenting to a search of their shared premises." (*Henderson, supra*, 536 F.3d at p. 783.) Like *Henderson*, we think such a rule "extends *Randolph* too far." (*Ibid.*)

Finally, like the Fourth, Fifth, Seventh, and Eighth Circuits, we believe that the defendant's presence was indispensible to the decision in *Randolph*. We again quote *Henderson*, which well articulated the analysis: "[T]he fact of a conflict between present co-occupants plays a vital role in the *Randolph* majority's 'social expectations' premise; a third party, attuned to societal customs regarding shared premises, would not, '[w]ithout some very good reason,' enter when faced with a disputed invitation between cotenants. *Randolph*[, *supra*], 547 U.S. at [p.] 113 [126 S.Ct. 1515]. The calculus shifts, however, when the tenant seeking to deny entry is no longer present. His objection loses its force because he is not there to enforce it . . . ." (*Henderson, supra*, 536 F.3d at pp. 783–784.)

█ For all of these reasons, we conclude that Rojas's consent to a search of the apartment she shared with defendant was valid, and thus the trial court did not err in denying defendant's motion to exclude.

II.–IV.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*See footnote, *ante*, page 100.

## DISPOSITION

The conviction on count 2, willful infliction of corporal injury on a spouse, cohabitant, or child's parent, is conditionally reversed, with directions to the trial court to review relevant portions of Officer Cirrito's personnel records in chambers. If the trial court determines that the records contain no relevant information, it shall reinstate the judgment as to count 2. If it determines that the records contain some relevant information, it shall give defendant a reasonable opportunity to investigate the disclosed material and order a new trial if he demonstrates a reasonable probability of a different outcome had the evidence been disclosed; otherwise, the court shall reinstate the judgment as to count 2. In all other respects, the judgment is affirmed.

Epstein, P. J., and Willhite, J., concurred.

A petition for a rehearing was denied August 22, 2012, and appellant's petition for review by the Supreme Court was denied October 31, 2012, S205218.