Filed 6/27/13  P. v. Aguilar CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E054955 |
| v. | (Super.Ct.No. INF10002465) |
| LOUIE AGUILAR, JR., | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Steven G. Counelis and Arjuna T. Saraydarian (retired judge of the Riverside Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.), Judges.[1]  Conditionally reversed and remanded with directions.

Kathleen M. Redmond, under appointment by the Court of Appeal, for Defendant and Appellant.

---

[1] Judge Counelis denied defendant's motion under *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).  Judge Saraydarian presided over defendant's trial.

1

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Quisteen Shum and Raquel M. Gonzalez, Deputy Attorneys General, for Plaintiff and Respondent.

## I. INTRODUCTION

Defendant Louie Aguilar, Jr., appeals from his conviction of assault by means of force likely to produce great bodily injury (Pen. Code,[2] § 245, subd. (a); count 1), resisting an executive officer in the performance of duty (§ 69; count 2), and misdemeanor vandalism (§ 594, subd. (a); count 3), with true findings on enhancement allegations of a strike prior conviction (§§ 667, subds. (c), (e)(1), and 1170.12, subd. (c)(1)) and a prison term prior conviction (§ 667.5, subd. (b)).

Defendant contends the trial court denied him his constitutional right to confront witnesses when it limited cross-examination of witnesses regarding evidence relevant to credibility. In addition, defendant requests this court to examine the confidential files the trial court viewed under *Pitchess* to determine if his motion for discovery of police officers' records was properly decided. We conclude the trial court abused its discretion in ruling on defendant's *Pitchess* motion, and we therefore conditionally reverse defendant's conviction.

---

[2] All further statutory references are to the Penal Code unless otherwise specified.

## II.  FACTS AND PROCEDURAL BACKGROUND

### A.  Deputy Reynaga's Testimony

About 12:30 a.m. on August 5, 2010, Vanessa Gonzalez[3] placed a 911 call to report receiving annoying telephone calls.  When Deputy Sheriff Christian Reynaga responded to her home on Lapiz Drive in Coachella, Vanessa told him she would prefer to speak with him on the telephone because the caller had threatened to break windows and burn her house down; she thought the caller might be in the neighborhood and she did not want the caller to know she had contacted the police.  The deputy left and called Vanessa by telephone.  She said she did not know who had made the calls, and she requested extra patrols in the area.  The deputy told her that officers would try to drive by more often that night.

Later that morning, Deputy Reynaga received a second call from dispatch regarding a 911 call reporting a disturbance at the Gonzalez residence.  Vanessa told the deputy a man had been knocking on the door, but he was gone.  She knew the man's name was Louie, and he had been a former boyfriend of her sister, Veronica Gonzalez.  Vanessa again requested additional patrols, and the deputy left.

Within a few minutes, however, Deputy Reynaga received a third call from dispatch.  This time, Robert Gonzalez, Vanessa's and Veronica's brother, called 911 stating "some guy" was there hitting his sister.  Deputy Reynaga arrived at the Gonzalezes' address within a few minutes, and Deputy Richard Rodriguez pulled in

---

[3]  Because several witnesses bore the same surname, we will refer to them herein by their first names for clarity and convenience, and not intending any disrespect.

3

behind him. Deputy Reynaga saw a man standing next to Vanessa and Veronica in the yard; the man matched the description Vanessa had given earlier. He heard the man, defendant, swear and reach over to try to hug Veronica, and he heard Veronica say, "'I told you to get outta here.'" Deputy Reynaga detained defendant to determine if any crime had occurred.

Recordings of all three 911 calls were played for the jury, and the jury was provided with transcripts of the calls. In the second 911 call, Vanessa said her sister's ex-boyfriend was breaking down the door. Defendant could be heard yelling in the background for someone to come outside. Vanessa said defendant pulled Veronica outside, but she had pushed him out and locked the door. He had not tried to hit Veronica but only pulled her outside. He pushed the door open and the door hit Vanessa in the face. In the third 911 call, Robert said "Some guy's over here. He's hitting my sister." Robert said the man had broken into the house, was threatening him, and had tried to hit him.

After defendant was driven away in a patrol car by another officer, Deputy Reynaga spoke with Vanessa. She told him she had seen defendant and Veronica arguing. Defendant had pulled Veronica's hair and had then produced a cell phone charger cord, wrapped the ends around his fists, and tried to loop it over Veronica's head. Veronica ran away from defendant and he began chasing her. Vanessa ran into the house, grabbed a pair of scissors, and tried to defend her sister. Deputy Reynaga saw the scissors in Vanessa's hand. Deputy Reynaga recovered a phone charger cord from the ground, and Vanessa identified it as the one defendant had used.

4

Robert told Deputy Reynaga he heard a disturbance and followed his sisters outside. When he saw defendant try to loop a cord over Veronica's head, Robert ran inside and called 911. While Robert was on the phone, defendant threatened him with physical violence.

Veronica told Deputy Reynaga that defendant had come to the house and demanded she come outside. He began hitting his head on some landscape rocks. He then knocked on the door and threatened to continue until Veronica came outside. She finally complied. She told the deputy that defendant had taken the cord out of his pocket, but she denied that he pulled her hair or committed any violent act. She did not want to give a statement.

### B. Gonzalez Siblings' Testimony

#### 1. Vanessa

Vanessa testified that she did not want to be in court—the events had happened almost a year earlier, and she stated "there's no point." She made the first 911 call, but she did not know who had made threatening phone calls to the house. It could not have been defendant, because he was at the house when the call came in. Vanessa also made the second 911 call. She testified that defendant had been knocking loudly on the door, and it sounded like he was breaking it down. She thought he was drunk, and she did not want him at the house. Vanessa opened the door; defendant grabbed Veronica by the wrist, and they argued. Vanessa would not let Veronica go outside. Defendant was then in the yard hitting himself with landscape rocks. Veronica did not want Vanessa to call

5

911. Vanessa admitted she sounded scared on the 911 tape; she testified she had been scared for her sister.

Vanessa denied defendant had tried to hurt Veronica with the cord. She denied telling the deputy that defendant had tried to loop the cord over Veronica's neck. She testified that he had a phone charger cord and "was, like, just screaming with it in his hands." The cord "was wrapped around each one of his hands; each end of the cord was wrapped around his hands," and his hands were about seven inches apart. He did not do anything with the cord because Vanessa would not let him—she pulled the cord out of his hands and threw it on the ground. She had a "long pair of scissors" that she used to keep defendant away from Veronica.

### 2. Robert

Robert testified that he did not want to be in court and felt it was a waste of time. He stated, "It was a long time ago. I forgot about it. It's the past. I got over it." He testified that defendant was his sister's former boyfriend. He confirmed he had placed the third 911 call. Before he made the call, he had been sleeping and was awakened by banging on the door. He saw his sisters closing the door with force, and he then called 911. Although he had said on the 911 call that defendant was hitting his sister, that was not true; he had made the statement so the police would hurry. Robert had gone outside, grabbed Veronica, and had gone back inside. When he went outside, he saw defendant arguing. He did not remember seeing Vanessa with scissors and did not remember that defendant had a black cable. He did not remember talking to an officer and did not remember telling an officer that he had seen defendant loop a cable around his hands.

6

### 3. *Veronica*

Veronica testified that defendant was a former boyfriend. She stated she did not want to be in court; that she would "much rather" be at work, her brother had school and her sister had work, and she believed it was a waste of time. She had no desire to talk about the events of August 5, 2010, and she did not "feel anything of significance happened." She testified that she had been drinking that night and did not remember the events very clearly. She had just broken up with defendant on August 5 and had "tried to move on."

She remembered that defendant banged on her door that night. She opened the door and told him he needed to leave. Her sister called the police because defendant would not leave, and he was "being loud outside." She did not remember forcing the door closed or trying to hold it closed. She went outside but then returned inside when her brother and sister asked her to, and she did not go outside again. Defendant had been hitting himself on the head with rocks in the front yard. She had not spoken to the deputies the first time they showed up, and she did not remember speaking to them at all. She said she had been "obviously emotionally unstable," and her brother was trying to keep her inside. She repeated that she did not remember speaking to any officers. Her sister told her that the officers had taken defendant, and she could hear yelling. One officer asked her if she was okay and she said she was. He asked if she wanted to press charges, and she said she did not. An officer showed her a black cable and asked if defendant had tried to put it around her neck. She did not believe he had been trying to do that. She had also told an officer she was okay and she did not want to press charges.

7

On cross-examination, she testified that she hugged defendant when she saw the officers pull up and asked him why he had made such a scene. Defendant had been drinking and acting strangely that night; he had not been taking his medication. Defendant had never been violent with her. She had had no contact with defendant since that night, and she did not have a current relationship with him.

## C. Resisting an Officer and Misdemeanor Vandalism

Deputy Reynaga testified that when he detained defendant and handcuffed him so he could talk to the witnesses, defendant struggled. During the struggle, defendant kicked Deputy Reynaga. Deputy Reynaga activated his digital recorder during the struggle, and the audiotape was played for the jury. Deputy Rodriguez testified that he reported to the Lapiz Drive address and saw Deputy Reynaga handcuffing a subject. Deputies Rodriguez and Abrego testified as to the struggle to get defendant into the patrol car. Defendant continued kicking and slamming his head while in the backseat of the patrol car, and his kicking and head slamming cracked the anchor points of the Plexiglas shield that protected the door.

## D. Verdict and Sentence

The jury found defendant guilty of assault by means of force likely to produce great bodily injury (§ 245, subd. (a); count 1), resisting an executive officer in the performance of duty (§ 69; count 2), and misdemeanor vandalism (§ 594, subd. (a); count 3). The trial court found true the allegations of a strike prior and a prison term prior (§ 667, subds. (c), (e)(1), 1170.12, subd. (c)(1), 667.5, subd. (b)).

8

The trial court sentenced defendant to the middle term of three years for count 1, doubled as a second strike (§ 667, subd. (e)(1)), and to a concurrent term of four years for count 2. The court imposed a consecutive one-year enhancement for the prison term prior and sentenced defendant to 365 days with credit for time served for his misdemeanor conviction in count 3.

Additional facts are set forth in the discussion of the issues to which they pertain.

## III. DISCUSSION

### A. Limitation on Cross-Examination of Witnesses

Defendant contends the trial court denied him his constitutional right to confront witnesses when it limited cross-examination of witnesses regarding evidence relevant to credibility.

#### 1. Additional Background

During cross-examination of Vanessa, defense counsel tried to elicit testimony that Vanessa appeared to be uncooperative with the prosecution because an investigator from the district attorney's office had shot the family dog. The prosecutor objected on the grounds of relevance and facts not in evidence. Defense counsel argued that the evidence explained the witness's state of mind while testifying. The trial court sustained the objection and struck Vanessa's response that she was very upset about the incident. Defense counsel later attempted to elicit similar evidence from Veronica, but the trial court again sustained an objection. However, the trial court did not strike Veronica's response that she was "[v]ery much" angry "because of the incident with [her] dog."

9

After the Gonzalez siblings testified, the prosecutor moved "for purposes of remaining testimony and closes, no more mention of shooting dogs." Both counsel noted that an investigating officer who had gone to the Gonzalez residence to serve subpoenas had been bitten by one of the family's dogs and he shot the dog in the leg. That officer was not involved in the events of August 5. The trial court agreed with the prosecutor that the incident would not be mentioned.

### 2. Analysis

A criminal defendant has the right to a reasonable opportunity to effectively cross-examine the witnesses against him. (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 680.) """"However, not every restriction on a defendant's desired method of cross-examination is a constitutional violation. Within the confines of the confrontation clause, the trial court retains wide latitude in restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance. [Citations.] California law is in accord. [Citation.] Thus, unless the defendant can show that the prohibited cross-examination would have produced 'a significantly different impression of [the witnesses'] credibility" [citation], the trial court's exercise of its discretion in this regard does not violate the Sixth Amendment. [Citation.]' Citations.]" (*People v. Virgil* (2011) 51 Cal.4th 1210, 1251.) The harmless-beyond-reasonable-doubt standard of review applies to the denial of the opportunity to cross-examine adverse witnesses on matters pertinent to their credibility. (*People v. Chatman* (2006) 38 Cal.4th 344, 372; *Chapman v. California* (1967) 386 U.S. 18, 36.) However, we do not assume prejudice "even when the defendant has been denied *any* opportunity to impeach a witness for bias." (*People v.*

10

*Hernandez* (2012) 53 Cal.4th 1095, 1108.)  In determining whether the defendant was prejudiced by the improper limitation on cross-examination, we consider, among other factors, whether the excluded evidence was cumulative, the extent of the cross-examination that was allowed, the degree of evidence corroborating or contradicting the witness, and the strength of the prosecution's case.  (*Hernandez*, *supra*, at p. 1108, citing *Delaware v. Van Arsdall*, *supra*, at p. 684.)  We examine each of those factors below.

(a)  Cumulativeness

The excluded evidence was not cumulative to other admitted evidence.

(b)  Extent of cross-examination that was allowed

Vanessa's direct and redirect testimony covered approximately 30 pages of the reporter's transcript.  Cross-examination covered approximately 11 pages.  Defense counsel cross-examined Vanessa as to what she had seen when the officers were taking defendant into custody  Defense counsel also cross-examined her about why she had said it was a waste of time for her to be in court, and she responded, "Because it's—there's no reason—I didn't know that the cops just going to my house just to remove him was going to lead to all this time that I'm missing from work, and my brother's missing school.  It's—it's pointless.  He's not a worry to me.  I could care less what happens to him, whether he stays in here or whether he gets out.  There's, I feel, no reason to be here."  Defense counsel asked why she had been upset earlier, and she responded, "It hurts me to hear my sister screaming again, no matter if I heard it before; it hurts me."  She testified she was "[v]ery upset" about having to testify again (an earlier trial had resulted in a

11

mistrial). Defense counsel then questioned her about the events between defendant and Veronica that night.

Robert's direct testimony covered approximately 10 pages of the reporter's transcript. Cross-examination covered approximately two pages. Defense counsel cross-examined Robert about why he had not wanted to come to court, and Robert responded, "Because it's a waste of time" and "it's something that was escalated into a bigger thing." He explained, "Like, you guys made a little thing into a bigger thing. But that's all I know, because I didn't see what happened, so I don't—I can't really say if it was a big thing or not."

Veronica's direct testimony covered approximately seven pages of the reporter's transcript. Cross-examination covered approximately eight pages. Defense counsel cross-examined Veronica on whether defendant was acting strangely that night and about his mental state and medications for his mental health.

In short, defense counsel was provided an ample opportunity to cross-examine the witnesses on other matters relevant to their willingness to testify against defendant. And when defense counsel asked each of the Gonzalez siblings general or open-ended questions about why they did not want to be in court, none of them volunteered as a reason that they were upset about the dog shooting incident.

(c) Degree of corroborating and contradictory evidence

The audiotapes of the 911 calls provided significant corroboration of Deputy Reynaga's testimony. In addition, the Gonzalezes corroborated at least portions of his testimony. The cell phone charger cord was found in the Gonzalezes' yard. Deputies

12

Rodriguez and Abrego corroborated evidence that defendant was out of control that evening. In contrast, although Veronica denied that she remembered speaking to any officers that night, she did testify as to certain conversations with them. Robert admitted he lied to officers when making the 911 call.

(d) Strength of prosecution case

Deputy Reynaga testimony provided a strong case against defendant. As discussed above, his testimony was significantly corroborated, and defense counsel cross-examined the witnesses as to factors relevant to their willingness to cooperate with the prosecution of defendant. Considering all the *Delaware v. Van Arsdall* factors together, we conclude the restriction on cross-examination was harmless beyond a reasonable doubt.

### B. Review of *Pitchess* Files

Defendant requests this court to examine the confidential files the trial court viewed under *Pitchess* to determine if his motion for discovery of police officers' records was properly decided.

*1. Additional Background*

Defendant's counsel moved before trial for discovery of "records and information in the files of the Riverside County Sheriff . . . relating to the conduct, actions and credibility," and more specifically, records and information relating to "acts indicating or constituting excessive force, unlawful arrest, dishonesty, fabricating charges, falsifying reports and/or any act evincing morally lax character," (bolding omitted) of Deputies Rodriguez and Reynaga. The trial court granted the motion and held an in camera

13

hearing, at which it reviewed personnel files produced by the Riverside County Sheriff. Following the hearing, the trial court ruled that it found no relevant information pursuant to the motion.

### 2. Standard of Review

A motion for discovery of police officer records is addressed solely to the discretion of the trial court, and we review the trial court's ruling under the deferential abuse of discretion standard. (*Alford v. Superior Court* (2003) 29 Cal.4th 1033, 1039.)

### 3. Analysis

An accused is generally entitled to discover all relevant and material information in the possession of the prosecution that will aid him in the preparation of a defense. (*Hinojosa v. Superior Court* (1976) 55 Cal.App.3d 692, 696.)

Our review of the sealed personnel files reveals materials clearly pertinent to the issues raised by the *Pitchess* discovery motion in that the files contain complaints alleging perjury and excessive force. Although the complaints were determined to be unfounded, "[u]nsustained complaints are discoverable as well as sustained complaints." (*People v. Zamora* (1980) 28 Cal.3d 88, 93, fn. 1, citing *Saulter v. Municipal Court* (1977) 75 Cal.App.3d 231, 240 [*Saulter* superseded by statute on another ground in *People v. Superior Court (Barrett)* (2000) 80 Cal.App.4th 1305, 1319]; see also *Kelvin L. v. Superior Court* (1976) 62 Cal.App.3d 823, 829 (*Kelvin L.*)

In *Kelvin L.* the court explained, "Nor does the fact that the previous charges against the officers were not substantiated render them irrelevant for purposes of discovery. As to the two charges which were 'not sustained,' there were no witnesses to

14

the event other than the complaining citizen and the officer. The department concluded that it could not fully resolve the issue on the basis of such evidence. Surely we cannot say that an interview with these complainants would be irrelevant to preparation of petitioner's defense. As to the charge of which [one officer] was exonerated, there were three civilian witnesses to that incident who contradicted the citizen who lodged the complaint. Presumably they will give petitioner's counsel the same version they told police investigators. If they do, counsel will undoubtedly choose not to use their testimony. [¶] The fact remains that under our constitutional system the burden for preparing a criminal defendant's case rests with his counsel, not with the police department. That burden cannot be properly discharged unless counsel has direct access to potential witnesses, for it is counsel who must decide if they can aid his client, not the police department's internal affairs division, however sincere and well motivated the latter may be." (*Kelvin L.*, *supra*, 62 Cal.App.3d at p. 829.)

We therefore conclude the trial court abused its discretion in failing to order disclosure of relevant information. Consequently, we will conditionally reverse defendant's conviction with directions to the trial court to disclose the relevant information in the officers' personnel files and to give defendant a reasonable opportunity to investigate the disclosed material and request a new trial if he demonstrates a reasonable probability of a different outcome had the evidence been disclosed. Otherwise, the trial court shall reinstate the judgment. (See *People v. Fernandez* (2012) 208 Cal.App.4th 100, 123.)

## IV.  DISPOSITION

We conditionally reverse defendant's conviction with directions to the trial court to order disclosure of relevant information in the officers' personnel files, to allow defendant a reasonable opportunity to investigate the disclosed material and demonstrate prejudice, and to order a new trial if there is a reasonable probability of a different outcome had the evidence been disclosed.  Otherwise, the trial court shall reinstate the judgment.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

HOLLENHORST
Acting P. J.

We concur:

RICHLI
J.

MILLER
J.