(Slip Opinion) OCTOBER TERM, 2013 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## FERNANDEZ *v.* CALIFORNIA

### CERTIORARI TO THE COURT OF APPEAL OF CALIFORNIA, SECOND APPELLATE DISTRICT

No. 12–7822. Argued November 13, 2013—Decided February 25, 2014

Police officers observed a suspect in a violent robbery run into an apartment building, and heard screams coming from one of the apartments. They knocked on the apartment door, which was answered by Roxanne Rojas, who appeared to be battered and bleeding. When the officers asked her to step out of the apartment so that they could conduct a protective sweep, petitioner came to the door and objected. Suspecting that he had assaulted Rojas, the officers removed petitioner from the apartment and placed him under arrest. He was then identified as the perpetrator in the earlier robbery and taken to the police station. An officer later returned to the apartment and, after obtaining Rojas' oral and written consent, searched the premises, where he found several items linking petitioner to the robbery. The trial court denied petitioner's motion to suppress that evidence, and he was convicted. The California Court of Appeal affirmed. It held that because petitioner was not present when Rojas consented to the search, the exception to permissible warrantless consent searches of jointly occupied premises that arises when one of the occupants present objects to the search, *Georgia* v. *Randolph*, 547 U. S. 103, did not apply, and therefore, petitioner's suppression motion had been properly denied.

*Held*: *Randolph* does not extend to this situation, where Rojas' consent was provided well after petitioner had been removed from their apartment. Pp. 5–15.

  (a) Consent searches are permissible warrantless searches, *Schneckloth* v. *Bustamonte*, 412 U. S. 218, 228, 231–232, and are clearly reasonable when the consent comes from the sole occupant of the premises. When multiple occupants are involved, the rule extends to the search of the premises or effects of an absent, noncon-

senting occupant so long as "the consent of one who possesses com-
mon authority over [the] premises or effects" is obtained. *United
States* v. *Matlock*, 415 U. S. 164, 170. However, when "a physically
present inhabitan[t]" refuses to consent, that refusal "is dispositive as
to him, regardless of the consent of a fellow occupant." *Randolph*,
547 U. S., at 122–123. A controlling factor in *Randolph* was the ob-
jecting occupant's physical presence. See, *e.g., id.*, at 106, 108, 109,
114. Pp. 5–9.

  (b) Petitioner contends that, though he was not present when Rojas
consented, *Randolph* nevertheless controls, but neither of his argu-
ments is sound. Pp. 9–14.

    (1) He first argues that his absence should not matter since it oc-
curred only because the police had taken him away. Dictum in *Ran-
dolph* suggesting that consent by one occupant might not be sufficient
if "there is evidence that the police have removed the potentially ob-
jecting tenant from the entrance for the sake of avoiding a possible
objection," 547 U. S., at 121, is best understood to refer to situations
in which the removal of the potential objector is not objectively rea-
sonable. Petitioner does not contest the fact that the police had rea-
sonable grounds for his removal or the existence of probable cause for
his arrest. He was thus in the same position as an occupant absent
for any other reason. Pp. 9–10.

    (2) Petitioner also argues that the objection he made while at the
threshold remained effective until he changed his mind and withdrew
it. This is inconsistent with *Randolph* in at least two important
ways. It cannot be squared with the "widely shared social expecta-
tions" or "customary social usage" upon which *Randolph*'s holding
was based. 547 U. S., at 111, 121. It also creates the sort of practical
complications that *Randolph* sought to avoid by adopting a "formal-
is[tic]" rule, *id.*, at 121, *e.g.*, requiring that the scope of an objection's
duration and the procedures necessary to register a continuing objec-
tion be defined. Pp. 10–14.

  (c) Petitioner claims that his expansive interpretation of *Randolph*
would not hamper law enforcement because in most cases where of-
ficers have probable cause to arrest a physically present objector they
also have probable cause to obtain a warrant to search the premises
that the objector does not want them to enter. But he misunder-
stands the constitutional status of consent searches, which are per-
missible irrespective of the availability of a warrant. Requiring offic-
ers to obtain a warrant when a warrantless search is justified may
interfere with law enforcement strategies and impose an unmerited
burden on the person willing to consent to an immediate search.
Pp. 14–15.

208 Cal. App. 4th 100, 145 Cal. Rptr. 3d 51, affirmed.

Syllabus

ALITO, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, KENNEDY, THOMAS, and BREYER, JJ., joined.  SCALIA, J., and THOMAS, J., filed concurring opinions.  GINSBURG, J., filed a dissenting opinion, in which SOTOMAYOR and KAGAN, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 12–7822

_____

## WALTER FERNANDEZ, PETITIONER *v.* CALIFORNIA

ON WRIT OF CERTIORARI TO THE COURT OF APPEAL OF CALIFORNIA FOR THE SECOND APPELLATE DISTRICT

[February 25, 2014]

JUSTICE ALITO delivered the opinion of the Court.

Our cases firmly establish that police officers may search jointly occupied premises if one of the occupants[1] consents. See *United States* v. *Matlock*, 415 U. S. 164 (1974). In *Georgia* v. *Randolph*, 547 U. S. 103 (2006), we recognized a narrow exception to this rule, holding that the consent of one occupant is insufficient when another occupant is present and objects to the search. In this case, we consider whether *Randolph* applies if the objecting occupant is absent when another occupant consents. Our opinion in *Randolph* took great pains to emphasize that its holding was limited to situations in which the objecting occupant is physically present. We therefore refuse to extend *Randolph* to the very different situation in this case, where consent was provided by an abused woman well after her male partner had been removed from the apartment they shared.

_____

[1] We use the terms "occupant," "resident," and "tenant" interchangeably to refer to persons having "common authority" over premises within the meaning of *Matlock*. See *United States* v. *Matlock*, 415 U. S. 164, 171, n. 7 (1974).

# I

## A

The events involved in this case occurred in Los Angeles in October 2009. After observing Abel Lopez cash a check, petitioner Walter Fernandez approached Lopez and asked about the neighborhood in which he lived. When Lopez responded that he was from Mexico, Fernandez laughed and told Lopez that he was in territory ruled by the "D.F.S.," *i.e.*, the "Drifters" gang. App. 4–5. Petitioner then pulled out a knife and pointed it at Lopez' chest. Lopez raised his hand in self-defense, and petitioner cut him on the wrist.

Lopez ran from the scene and called 911 for help, but petitioner whistled, and four men emerged from a nearby apartment building and attacked Lopez. After knocking him to the ground, they hit and kicked him and took his cell phone and his wallet, which contained $400 in cash.

A police dispatch reported the incident and mentioned the possibility of gang involvement, and two Los Angeles police officers, Detective Clark and Officer Cirrito, drove to an alley frequented by members of the Drifters. A man who appeared scared walked by the officers and said: "'[T]he guy is in the apartment.'" *Id.,* at 5. The officers then observed a man run through the alley and into the building to which the man was pointing. A minute or two later, the officers heard sounds of screaming and fighting coming from that building.

After backup arrived, the officers knocked on the door of the apartment unit from which the screams had been heard. Roxanne Rojas answered the door. She was holding a baby and appeared to be crying. Her face was red, and she had a large bump on her nose. The officers also saw blood on her shirt and hand from what appeared to be a fresh injury. Rojas told the police that she had been in a fight. Officer Cirrito asked if anyone else was in the apartment, and Rojas said that her 4-year-old son was the

only other person present.

After Officer Cirrito asked Rojas to step out of the apartment so that he could conduct a protective sweep, petitioner appeared at the door wearing only boxer shorts. Apparently agitated, petitioner stepped forward and said, "'You don't have any right to come in here. I know my rights.'" *Id.*, at 6. Suspecting that petitioner had assaulted Rojas, the officers removed him from the apartment and then placed him under arrest. Lopez identified petitioner as his initial attacker, and petitioner was taken to the police station for booking.

Approximately one hour after petitioner's arrest, Detective Clark returned to the apartment and informed Rojas that petitioner had been arrested. Detective Clark requested and received both oral and written consent from Rojas to search the premises.[2] In the apartment, the police found Drifters gang paraphernalia, a butterfly knife, clothing worn by the robbery suspect, and ammunition. Rojas' young son also showed the officers where petitioner had hidden a sawed-off shotgun.

## B

Petitioner was charged with robbery, Cal. Penal Code Ann. §211 (West 2008), infliction of corporal injury on a

_____

[2] Both petitioner and the dissent suggest that Rojas' consent was coerced. *Post*, at 9, n. 5 (opinion of GINSBURG, J.). But the trial court found otherwise, App. 152, and the correctness of that finding is not before us. In suggesting that Rojas' consent was coerced, the dissent recites portions of Rojas' testimony from the suppression hearing that the trial judge appears to have rejected. *Ibid.* Similarly, the jury plainly did not find Rojas to be credible. At trial, she testified for the defense and told the jury, among other things, that the wounds observed by the officers who came to her door were not inflicted by petitioner but by a woman looking for petitioner during a fight. 208 Cal. App. 4th 100, 109–110, 145 Cal. Rptr. 3d 51, 56 (2012). The jury obviously did not believe this testimony because it found petitioner guilty of inflicting corporal injury on her.

spouse, cohabitant, or child's parent, §273.5(a), possession of a firearm by a felon, §12021(a)(1)(West 2009), possession of a short-barreled shotgun, §12020(a)(1), and felony possession of ammunition, §12316(b)(1).

Before trial, petitioner moved to suppress the evidence found in the apartment, but after a hearing, the court denied the motion. Petitioner then pleaded *nolo contendere* to the firearms and ammunition charges. On the remaining counts—for robbery and infliction of corporal injury—he went to trial and was found guilty by a jury. The court sentenced him to 14 years of imprisonment.

The California Court of Appeal affirmed. 208 Cal. App. 4th 100, 145 Cal. Rptr. 3d 51 (2012). Because *Randolph* did not overturn our prior decisions recognizing that an occupant may give effective consent to search a shared residence, the court agreed with the majority of the federal circuits that an objecting occupant's physical presence is "indispensable to the decision in *Randolph*." *Id.*, at 122, 145 Cal. Rptr. 3d, at 66.[3] And because petitioner was not

---

[3] See *United States* v. *Cooke*, 674 F. 3d 491, 498 (CA5 2012) ("*Randolph* was a narrow exception to the general *Matlock* rule permitting cotenant consent, relevant only as to physically present objectors"); *United States* v. *Hudspeth*, 518 F. 3d 954, 960 (CA8 2008) (concluding that "the narrow holding of *Randolph*, which repeatedly referenced the defendant's physical presence *and* immediate objection is inapplicable"); *United States* v. *Henderson*, 536 F. 3d 776, 777 (CA7 2008) (recognizing that "*Randolph* left the bulk of third-party consent law in place; its holding applies only when the defendant is both present and objects to the search of his home"); *United States* v. *McKerrell*, 491 F. 3d 1221, 1227 (CA10 2007) ("*Randolph* carefully delineated the narrow circumstances in which its holding applied, and . . . *Randolph* consciously employed a rule requiring an express objection by a present co-tenant"); but see *United States* v. *Murphy*, 516 F. 3d 1117, 1124–1125 (CA9 2008) (holding that "when a co-tenant objects to a search and another party with common authority subsequently gives consent to that search in the absence of the first co-tenant the search is invalid as to the objecting co-tenant" because "[o]nce a co-tenant has registered his objection, his refusal to grant consent remains effective barring

present when Rojas consented, the court held that petitioner's suppression motion had been properly denied. *Id.*, at 121, 145 Cal. Rptr. 3d, at 65.

The California Supreme Court denied the petition for review, and we granted certiorari. 569 U. S. \_\_\_ (2013).

## II

### A

The Fourth Amendment prohibits unreasonable searches and seizures and provides that a warrant may not be issued without probable cause, but "the text of the Fourth Amendment does not specify when a search warrant must be obtained." *Kentucky* v. *King*, 563 U. S. \_\_\_, \_\_\_ (2011) (slip op., at 5). Our cases establish that a warrant is generally required for a search of a home, *Brigham City* v. *Stuart*, 547 U. S. 398, 403 (2006), but "the ultimate touchstone of the Fourth Amendment is 'reasonableness,'" *ibid.*; see also *Michigan* v. *Fisher*, 558 U. S. 45, 47 (2009) (*per curiam*). And certain categories of permissible warrantless searches have long been recognized.

Consent searches occupy one of these categories. "Consent searches are part of the standard investigatory techniques of law enforcement agencies" and are "a constitutionally permissible and wholly legitimate aspect of effective police activity." *Schneckloth* v. *Bustamonte*, 412 U. S. 218, 228, 231–232 (1973). It would be unreasonable—indeed, absurd—to require police officers to obtain a warrant when the sole owner or occupant of a house or apartment voluntarily consents to a search. The owner of a home has a right to allow others to enter and examine the premises, and there is no reason why the owner should not be permitted to extend this same privilege to police officers if that is the owner's choice. Where the owner believes

---

some objective manifestation that he has changed his position and no longer objects").

that he or she is under suspicion, the owner may want the police to search the premises so that their suspicions are dispelled. This may be particularly important where the owner has a strong interest in the apprehension of the perpetrator of a crime and believes that the suspicions of the police are deflecting the course of their investigation. An owner may want the police to search even where they lack probable cause, and if a warrant were always required, this could not be done. And even where the police could establish probable cause, requiring a warrant despite the owner's consent would needlessly inconvenience everyone involved—not only the officers and the magistrate but also the occupant of the premises, who would generally either be compelled or would feel a need to stay until the search was completed. *Michigan* v. *Summers*, 452 U. S. 692, 701 (1981).[4]

While it is clear that a warrantless search is reasonable when the sole occupant of a house or apartment consents, what happens when there are two or more occupants? Must they all consent? Must they all be asked? Is consent by one occupant enough? The Court faced that problem 40 years ago in *United States* v. *Matlock*, 415 U. S. 164 (1974).

In that case, Matlock and a woman named Graff were living together in a house that was also occupied by several of Graff's siblings and by her mother, who had rented the house. While in the front yard of the house, Matlock was arrested for bank robbery and was placed in a squad car. Although the police could have easily asked him for

––––––––––––

[4] A main theme of the dissent is that the police in this case had probable cause to search the apartment and therefore could have obtained a warrant. Of course, this will not always be so in cases in which one occupant consents to a search and the other objects, and the dissent does not suggest that a warrant should be required only when probable cause is present. As a result, the dissent's repeated references to the availability of a warrant in this case are beside the point.

consent to search the room that he and Graff shared, they did not do so. Instead, they knocked on the door and obtained Graff's permission to search. The search yielded incriminating evidence, which the defendant sought to suppress, but this Court held that Graff's consent justified the warrantless search. As the Court put it, "the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared." *Id.*, at 170.

In *Illinois* v. *Rodriguez*, 497 U. S. 177 (1990), the Court reaffirmed and extended the *Matlock* holding. In *Rodriguez*, a woman named Fischer told police officers that she had been assaulted by Rodriguez in what she termed "'our' apartment." 497 U. S., at 179. She also informed the officers that Rodriguez was asleep in the apartment, and she then accompanied the officers to that unit. When they arrived, the officers could have knocked on the door and awakened Rodriguez, and had they done so, Rodriguez might well have surrendered at the door and objected to the officers' entry. Instead, Fischer unlocked the door, the officers entered without a warrant, and they saw drug paraphernalia and containers filled with white powder in plain view.

After the search, the police learned that Fischer no longer resided at the apartment, and this Court held that she did not have common authority over the premises at the time in question. The Court nevertheless held that the warrantless entry was lawful because the police reasonably believed that Fischer was a resident. *Id.*, at 188–189.

## B

While consent by one resident of jointly occupied premises is generally sufficient to justify a warrantless search, we recognized a narrow exception to this rule in *Georgia* v. *Randolph*, 547 U. S. 103 (2006). In that case, police offi-

cers responded to the Randolphs' home after receiving a report of a domestic dispute. When the officers arrived, Janet Randolph informed the officers that her estranged husband, Scott Randolph, was a cocaine user and that there were "items of drug evidence" in the house. *Id.*, at 107 (internal quotation marks omitted). The officers first asked Scott for consent to search, but he "unequivocally refused." *Ibid.* The officers then turned to Janet, and she consented to the search, which produced evidence that was later used to convict Scott for possession of cocaine.

Without questioning the prior holdings in *Matlock* and *Rodriguez*, this Court held that Janet Randolph's consent was insufficient under the circumstances to justify the warrantless search. The Court reiterated the proposition that a person who shares a residence with others assumes the risk that "any one of them may admit visitors, with the consequence that a guest obnoxious to one may nevertheless be admitted in his absence by another." 547 U. S., at 111. But the Court held that "*a physically present inhabitant's* express refusal of consent to a police search [of his home] is dispositive as to him, regardless of the consent of a fellow occupant." *Id.*, at 122–123 (emphasis added).

The Court's opinion went to great lengths to make clear that its holding was limited to situations in which the objecting occupant is present. Again and again, the opinion of the Court stressed this controlling factor. See *id.*, at 106 ("present at the scene"); *ibid.* ("physically present"); *id.*, at 108 ("a co-tenant who is present"); *id.*, at 109 ("physically present"); *id.*, at 114 ("a present and objecting co-tenant"); *id.*, at 119 (a co-tenant "standing at the door and expressly refusing consent"); *id.*, at 120 ("a physically present resident"), *id.*, at 121 ("a physically present fellow tenant objects"); *ibid.* ("[A] potential defendant with self-interest in objecting is at the door and objects"); *id.*, at 122 ("[A] physically present inhabitant's express refusal of

consent to a police search is dispositive as to him"). The Court's opinion could hardly have been clearer on this point, and the separate opinion filed by JUSTICE BREYER, whose vote was decisive, was equally unambiguous. See *id.*, at 126 (concurring) ("The Court's opinion does not apply where the objector is not present 'and object[ing]'").

### III

In this case, petitioner was not present when Rojas consented, but petitioner still contends that *Randolph* is controlling. He advances two main arguments. First, he claims that his absence should not matter since he was absent only because the police had taken him away. Second, he maintains that it was sufficient that he objected to the search while he was still present. Such an objection, he says, should remain in effect until the objecting party "no longer wishes to keep the police out of his home." Brief for Petitioner 8. Neither of these arguments is sound.

### A

We first consider the argument that the presence of the objecting occupant is not necessary when the police are responsible for his absence. In *Randolph*, the Court suggested in dictum that consent by one occupant might not be sufficient if "there is evidence that the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection." 547 U. S., at 121. We do not believe the statement should be read to suggest that improper motive may invalidate objectively justified removal. Hence, it does not govern here.

The *Randolph* dictum is best understood not to require an inquiry into the subjective intent of officers who detain or arrest a potential objector but instead to refer to situations in which the removal of the potential objector is not

objectively reasonable. As petitioner acknowledges, see Brief for Petitioner 25, our Fourth Amendment cases "have repeatedly rejected" a subjective approach. *Brigham City*, 547 U. S., at 404 (alteration and internal quotation marks omitted). "Indeed, we have never held, outside limited contexts such as an 'inventory search or administrative inspection . . . , that an officer's motive invalidates objectively justifiable behavior under the Fourth Amendment.'" *King*, 563 U. S., at ___ (slip op., at 10).

Petitioner does not claim that the *Randolph* Court meant to break from this consistent practice, and we do not think that it did. And once it is recognized that the test is one of objective reasonableness, petitioner's argument collapses. He does not contest the fact that the police had reasonable grounds for removing him from the apartment so that they could speak with Rojas, an apparent victim of domestic violence, outside of petitioner's potentially intimidating presence. In fact, he does not even contest the existence of probable cause to place him under arrest. We therefore hold that an occupant who is absent due to a lawful detention or arrest stands in the same shoes as an occupant who is absent for any other reason.

This conclusion does not "make a mockery of *Randolph*," as petitioner protests. Brief for Petitioner 9. It simply accepts *Randolph* on its own terms. The *Randolph* holding unequivocally requires the presence of the objecting occupant in every situation other than the one mentioned in the dictum discussed above.

B

This brings us to petitioner's second argument, viz., that his objection, made at the threshold of the premises that the police wanted to search, remained effective until he changed his mind and withdrew his objection. This argu-

ment is inconsistent with *Randolph*'s reasoning in at least two important ways. First, the argument cannot be squared with the "widely shared social expectations" or "customary social usage" upon which the *Randolph* holding was based. See 547 U. S., at 111, 121. Explaining why consent by one occupant could not override an objection by a physically present occupant, the *Randolph* Court stated:

> "[I]t is fair to say that a caller standing at the door of shared premises would have no confidence that one occupant's invitation was a sufficiently good reason to enter when a fellow tenant stood there saying, 'stay out.' Without some very good reason, no sensible person would go inside under those conditions." *Id.*, at 113.

It seems obvious that the calculus of this hypothetical caller would likely be quite different if the objecting tenant was not standing at the door. When the objecting occupant is standing at the threshold saying "stay out," a friend or visitor invited to enter by another occupant can expect at best an uncomfortable scene and at worst violence if he or she tries to brush past the objector. But when the objector is not on the scene (and especially when it is known that the objector will not return during the course of the visit), the friend or visitor is much more likely to accept the invitation to enter.[5] Thus, petitioner's

───────────

[5] Although the dissent intimates that "customary social usage" goes further than this, see *post*, at 4, the dissent provides no support for this doubtful proposition. In the present case, for example, suppose that Rojas had called a relative, a friend, a supportive neighbor, or a person who works for a group that aids battered women and had invited that individual to enter and examine the premises while petitioner was in jail. Would any of those invitees have felt that it was beyond Rojas' authority to extend that invitation over petitioner's objection?

Instead of attempting to show that such persons would have felt it improper to accept this invitation, the dissent quickly changes the

argument is inconsistent with *Randolph*'s reasoning.

Second, petitioner's argument would create the very sort of practical complications that *Randolph* sought to avoid. The *Randolph* Court recognized that it was adopting a "formalis[tic]" rule, but it did so in the interests of "simple clarity" and administrability. *Id.*, at 121, 122.

The rule that petitioner would have us adopt would produce a plethora of practical problems. For one thing, there is the question of duration. Petitioner argues that an objection, once made, should last until it is withdrawn by the objector, but such a rule would be unreasonable. Suppose that a husband and wife owned a house as joint tenants and that the husband, after objecting to a search of the house, was convicted and sentenced to a 15-year prison term. Under petitioner's proposed rule, the wife would be unable to consent to a search of the house 10 years after the date on which her husband objected. We refuse to stretch *Randolph* to such strange lengths.

Nor are we persuaded to hold that an objection lasts for a "reasonable" time. "[I]t is certainly unusual for this Court to set forth precise time limits governing police action," *Maryland* v. *Shatzer*, 559 U. S. 98, 110 (2010), and what interval of time would be reasonable in this context? A week? A month? A year? Ten years?

Petitioner's rule would also require the police and ultimately the courts to determine whether, after the passage of time, an objector still had "common authority" over the premises, and this would often be a tricky question. Suppose that an incarcerated objector and a consenting co-occupant were joint tenants on a lease. If the objector,

---

subject and says that "conjectures about social behavior shed little light on the constitutionality" of the search in this case. *Post*, at 4. But the holding in *Georgia* v. *Randolph*, 547 U. S. 103 (2006), was based on "widely shared social expectations" and "customary social usage." See *Id.*, at 111, 121. Thus, the dissent simply fails to come to grips with the reasoning of the precedent on which it relies.

after incarceration, stopped paying rent, would he still have "common authority," and would his objection retain its force? Would it be enough that his name remained on the lease? Would the result be different if the objecting and consenting lessees had an oral month-to-month tenancy?

Another problem concerns the procedure needed to register a continuing objection. Would it be necessary for an occupant to object while police officers are at the door? If presence at the time of consent is not needed, would an occupant have to be present at the premises when the objection was made? Could an objection be made preemptively? Could a person like Scott Randolph, suspecting that his estranged wife might invite the police to view his drug stash and paraphernalia, register an objection in advance? Could this be done by posting a sign in front of the house? Could a standing objection be registered by serving notice on the chief of police?

Finally, there is the question of the particular law enforcement officers who would be bound by an objection. Would this set include just the officers who were present when the objection was made? Would it also apply to other officers working on the same investigation? Would it extend to officers who were unaware of the objection? How about officers assigned to different but arguably related cases? Would it be limited by law enforcement agency?

If *Randolph* is taken at its word—that it applies only when the objector is standing in the door saying "stay out" when officers propose to make a consent search—all of these problems disappear.

In response to these arguments, petitioner argues that *Randolph*'s requirement of physical presence is not without its own ambiguity. And we acknowledge that if, as we conclude, *Randolph* requires presence on the premises to be searched, there may be cases in which the outer bound-

ary of the premises is disputed. The Court confronted a similar problem last Term in *Bailey* v. *United States*, 568 U. S. ___ (2013), but despite arguments similar to those now offered by petitioner, the Court adopted a rule that applies only when the affected individual is near the premises being searched. Having held that a premises rule is workable in that context, we see no ground for reaching a different conclusion here.

C

Petitioner argues strenuously that his expansive interpretation of *Randolph* would not hamper law enforcement because in most cases where officers have probable cause to arrest a physically present objector they also have probable cause to search the premises that the objector does not want them to enter, see Brief for Petitioner 20–23, but this argument misunderstands the constitutional status of consent searches. A warrantless consent search is reasonable and thus consistent with the Fourth Amendment irrespective of the availability of a warrant. Even with modern technological advances, the warrant procedure imposes burdens on the officers who wish to search, the magistrate who must review the warrant application, and the party willing to give consent. When a warrantless search is justified, requiring the police to obtain a warrant may "unjustifiably interfer[e] with legitimate law enforcement strategies." *King*, 563 U. S., at ___ (slip op., at 13). Such a requirement may also impose an unmerited burden on the person who consents to an immediate search, since the warrant application procedure entails delay. Putting the exception the Court adopted in *Randolph* to one side, the lawful occupant of a house or apartment should have the right to invite the police to enter the dwelling and conduct a search. Any other rule would trample on the rights of the occupant who is willing to consent. Such an occupant may want the police to

search in order to dispel "suspicion raised by sharing quarters with a criminal." 547 U. S., at 116; see also *Schneckloth*, 412 U. S., at 243 (evidence obtained pursuant to a consent search "may insure that a wholly innocent person is not wrongly charged with a criminal offense"). And an occupant may want the police to conduct a thorough search so that any dangerous contraband can be found and removed. In this case, for example, the search resulted in the discovery and removal of a sawed-off shotgun to which Rojas' 4-year-old son had access.

Denying someone in Rojas' position the right to allow the police to enter *her* home would also show disrespect for her independence. Having beaten Rojas, petitioner would bar her from controlling access to her own home until such time as he chose to relent. The Fourth Amendment does not give him that power.

* * *

The judgment of the California Court of Appeal is affirmed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 12–7822

_____

## WALTER FERNANDEZ, PETITIONER *v.* CALIFORNIA

ON WRIT OF CERTIORARI TO THE COURT OF APPEAL OF
CALIFORNIA FOR THE SECOND APPELLATE DISTRICT

[February 25, 2014]

JUSTICE SCALIA, concurring.

Like JUSTICE THOMAS, I believe *Georgia* v. *Randolph*, 547 U. S. 103 (2006), was wrongly decided. I nonetheless join the Court's opinion because it is a faithful application of *Randolph*. I write separately to address the argument that the search of petitioner's shared apartment violated the Fourth Amendment because he had a right under property law to exclude the police. See Brief for National Association of Criminal Defense Lawyers as *Amicus Curiae* 17–23. The United States dismisses that argument, pointing to our statement in *United States* v. *Matlock*, 415 U. S. 164, 171, n. 7 (1974), that a cotenant's ability to consent to a search "does not rest upon the law of property, with its attendant historical and legal refinements." See Brief for United States as *Amicus Curiae* 23.

I do not think the argument can be so easily dismissed. To be sure, under *Katz* v. *United States*, 389 U. S. 347 (1967), "property rights 'are not the sole measure of Fourth Amendment violations.'" *Florida* v. *Jardines*, 569 U. S. 1, \_\_\_ (2013) (slip op., at 3). But as we have recently made clear, "[t]he *Katz* reasonable-expectations test 'has been *added to*, not *substituted for*,' the traditional property-based understanding of the Fourth Amendment." *Id.,* at \_\_\_ (slip op., at 9) (quoting *United States* v. *Jones*, 565 U. S. \_\_\_, \_\_\_ (2012) (slip op., at 8)). I would therefore find this a more difficult case if it were established that prop-

erty law did not give petitioner's cotenant the right to admit visitors over petitioner's objection. That difficulty does not arise, however, because the authorities cited by the *amicus* association fail to establish that a guest would commit a trespass if one of two joint tenants invited the guest to enter and the other tenant forbade the guest to do so. Indeed, what limited authority there is on the subject points to the opposite conclusion. See, *e.g.,* 86 C. J. S., Tenancy in Common §144, p. 354 (2006) (a licensee of one tenant "is not liable in trespass to nonconsenting cotenants"); *Dinsmore* v. *Renfroe*, 66 Cal. App. 207, 212–214, 225 P. 886, 888–889 (1924); *Buchanan* v. *Jencks*, 38 R. I. 443, 446–451, 96 A. 307, 309–311 (1916) (and cases cited therein); cf. 2 H. Tiffany, Real Property §457, p. 274 (3d ed. 1939) (endorsing the opposite view but acknowledging that "there is little authority" on the question). There accordingly is no basis for us to conclude that the police infringed on any property right of petitioner's when they entered the premises with his cotenant's consent.

# SUPREME COURT OF THE UNITED STATES

_____

No. 12–7822

_____

## WALTER FERNANDEZ, PETITIONER *v.* CALIFORNIA

ON WRIT OF CERTIORARI TO THE COURT OF APPEAL OF
CALIFORNIA FOR THE SECOND APPELLATE DISTRICT

[February 25, 2014]

JUSTICE THOMAS, concurring.

I join the opinion of the Court, which faithfully applies *Georgia* v. *Randolph*, 547 U. S. 103 (2006). I write separately to make clear the extent of my disagreement with *Randolph*.

I dissented in *Randolph* because the facts of that case did not implicate a Fourth Amendment search and never should have been analyzed as such. *Id.*, at 145 (THOMAS, J., dissenting) ("[N]o Fourth Amendment search occurs where . . . the spouse of an accused voluntarily leads the police to potential evidence of wrongdoing by the accused"). Instead of deciding the case on that narrow ground, the majority in *Randolph* looked to "widely shared social expectations" to resolve whether the wife's consent to a search should control over her husband's objection. *Id.,* at 111. I find no support for that novel analytical approach in the Fourth Amendment's text or history, or in this Court's jurisprudence. See *id.,* at 128–131 (ROBERTS, C. J., dissenting). Accordingly, given a blank slate, I would analyze this case consistent with THE CHIEF JUSTICE's dissent in *Randolph*: "A warrantless search is reasonable if police obtain the voluntary consent of a person authorized to give it." *Id.,* at 128. That is because "[c]o-occupants have 'assumed the risk that one of their number might permit [a] common area to be searched.'" *Ibid.* (quoting *United States* v. *Matlock*, 415 U. S. 164, 171,

n. 7 (1974)).  In this case, the trial court found that Rojas'
consent was voluntary, see *ante,* at n. 2, and petitioner
does not contest that Rojas had common authority over the
premises.  That should be the end of the matter.

# SUPREME COURT OF THE UNITED STATES

_____

No. 12–7822

_____

## WALTER FERNANDEZ, PETITIONER *v.* CALIFORNIA

ON WRIT OF CERTIORARI TO THE COURT OF APPEAL OF
CALIFORNIA FOR THE SECOND APPELLATE DISTRICT

[February 25, 2014]

JUSTICE GINSBURG, with whom JUSTICE SOTOMAYOR
and JUSTICE KAGAN join, dissenting.

The Fourth Amendment guarantees to the people "[t]he
right . . . to be secure in their . . . houses . . . against un-
reasonable searches and seizures." Warrants to search
premises, the Amendment further instructs, shall issue
only when authorized by a neutral magistrate upon a
showing of "probable cause" to believe criminal activity
has occurred or is afoot. This Court has read these com-
plementary provisions to convey that, "whenever practica-
ble, [the police must] obtain advance judicial approval of
searches and seizures through the warrant procedure."
*Terry* v. *Ohio*, 392 U. S. 1, 20 (1968). The warrant re-
quirement, Justice Jackson observed, ranks among the
"fundamental distinctions between our form of govern-
ment, where officers are under the law, and the police-
state where they are the law." *Johnson* v. *United States*,
333 U. S. 10, 17 (1948). The Court has accordingly de-
clared warrantless searches, in the main, "*per se* unrea-
sonable." *Mincey* v. *Arizona*, 437 U. S. 385, 390 (1978)
(internal quotation marks omitted); see *Groh* v. *Ramirez*,
540 U. S. 551, 559 (2004). If this main rule is to remain
hardy, the Court has explained, exceptions to the warrant
requirement must be "few in number and carefully deline-
ated." *United States* v. *United States Dist. Court for East-
ern Dist. of Mich.*, 407 U. S. 297, 318 (1972); see *Kyllo* v.

*United States*, 533 U. S. 27, 31 (2001).

Instead of adhering to the warrant requirement, today's decision tells the police they may dodge it, nevermind ample time to secure the approval of a neutral magistrate. Suppressing the warrant requirement, the Court shrinks to petite size our holding in *Georgia* v. *Randolph*, 547 U. S. 103 (2006), that "a physically present inhabitant's express refusal of consent to a police search [of his home] is dispositive as to him, regardless of the consent of a fellow occupant," *id.*, at 122–123.

I

This case calls for a straightforward application of *Randolph*. The police officers in *Randolph* were confronted with a scenario closely resembling the situation presented here. Once the police arrived at Janet and Scott Randolph's shared residence, Scott Randolph "unequivocally refused" an officer's request for permission to search their home. *Georgia* v. *Randolph*, 547 U. S. 103, 107 (2006). The officer then asked Janet Randolph for her consent to the search, which she "readily gave." *Ibid.* The sequence here was similar. After Walter Fernandez, while physically present at his home, rebuffed the officers' request to come in, the police removed him from the premises and then arrested him, albeit with cause to believe he had assaulted his cohabitant, Roxanne Rojas. At the time of the arrest, Rojas said nothing to contradict Fernandez' refusal. About an hour later, however, and with no attempt to obtain a search warrant, the police returned to the apartment and prevailed upon Rojas to sign a consent form authorizing search of the premises. See *infra,* at 9, n. 5.

The circumstances triggering "the Fourth Amendment's traditional hostility to police entry into a home without a warrant," 547 U. S., at 126 (BREYER, J., concurring), are at least as salient here as they were in *Randolph*. In both

cases, "[t]he search at issue was a search solely for evidence"; "[t]he objecting party," while on the premises, "made his objection [to police entry] known clearly and directly to the officers seeking to enter the [residence]"; and "the officers might easily have secured the premises and sought a warrant permitting them to enter." *Id.,* at 125–126. Here, moreover, with the objector in custody, there was scant danger to persons on the premises, or risk that evidence might be destroyed or concealed, pending request for, and receipt of, a warrant. See *id.,* at 126.

Despite these marked similarities, the Court removes this case from *Randolph*'s ambit. The Court does so principally by seizing on the fact that Fernandez, unlike Scott Randolph, was no longer present and objecting when the police obtained the co-occupant's consent. *Ante,* at 8–9. But Fernandez *was* present when he stated his objection to the would-be searchers in no uncertain terms. See App. 6 ("You don't have any right to come in here. I know my rights." (internal quotation marks omitted)). The officers could scarcely have forgotten, one hour later, that Fernandez refused consent while physically present. That express, on-premises objection should have been "dispositive as to him." *Randolph*, 547 U. S., at 122.[1]

The Court tells us that the "widely shared social expec-

---

[1] The Court is correct that this case does not involve a situation, alluded to in *Randolph*, where "the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection." *Georgia* v. *Randolph*, 547 U. S. 103, 121 (2006). Here, as in *Randolph*, no one disputes that the police had probable cause to place the objecting tenant under arrest. But had the objector's arrest been illegal, *Randolph* suggested, the remaining occupant's consent to the search would not suffice. The suggestion in *Randolph*, as the Court recognizes, see *ante,* at 9–10, is at odds with today's decision. For "[i]f the police cannot prevent a co-tenant from objecting to a search through arrest, surely they cannot arrest a co-tenant and then seek to ignore an objection he has already made." *United States* v. *Murphy*, 516 F. 3d 1117, 1124–1125 (CA9 2008).

tations" and "customary social usage" undergirding *Randolph*'s holding apply only when the objector remains physically present. *Ante,* at 11 (internal quotation marks omitted). *Randolph*'s discussion of social expectations, however, does not hinge on the objector's physical presence *vel non* at the time of the search. "[W]hen people living together disagree over the use of their common quarters," *Randolph* observes, "a resolution must come through voluntary accommodation, not by appeals to authority." 547 U. S*.,* at 113–114. See also *id.,* at 114 ("[T]here is no common understanding that one co-tenant generally has a right or authority to prevail over the express wishes of another, whether the issue is the color of the curtains or invitations to outsiders."); *id.,* at 115 ("[T]he cooperative occupant's invitation adds nothing to the government's side to counter the force of an objecting individual's claim to security against the government's intrusion into his dwelling place."). *Randolph* thus trained on whether a joint occupant had conveyed an objection to a visitor's entry, and did not suggest that the objection could be ignored if the police reappeared post the objector's arrest.

A visitor might be less reluctant to enter over a joint occupant's objection, the Court speculates, if that visitor knows the objector will not be there. See *ante,* at 11–12. "Only in a Hobbesian world," however, "would one person's social obligations to another be limited to what the other[, because of his presence,] is . . . able to enforce." *United States* v. *Henderson*, 536 F. 3d 776, 787 (CA7 2008) (Rovner, J., dissenting). Such conjectures about social behavior, at any rate, shed little light on the constitutionality of this warrantless home search, given the marked distinctions between private interactions and police investigations. Police, after all, have power no private person enjoys. They can, as this case illustrates, put a tenant in handcuffs and remove him from the premises.

Moreover, as the Court comprehended just last Term, "the background social norms that invite a visitor to the front door do not invite him there to conduct a search." *Florida* v. *Jardines,* 569 U. S. 1, \_\_\_ (2013) (slip op., at 7). Similarly here, even if shared tenancy were understood to entail the prospect of visits by unwanted social callers while the objecting resident was gone, that unwelcome visitor's license would hardly include free rein to rummage through the dwelling in search of evidence and contraband.[2]

Next, the Court cautions, applying *Randolph* to these facts would pose "a plethora of practical problems." *Ante*, at 12. For instance, the Court asks, must a cotenant's objection, once registered, be respected indefinitely? Yet it blinks reality to suppose that Fernandez, by withholding consent, could stop police in their tracks eternally. Cf. *ante,* at 12–13 (imagining an objector behind bars serving his sentence, still refusing permission to search his residence). To mount the prosecution eventuating in a conviction, of course, the State would first need to obtain incriminating evidence, and could get it easily simply by applying for a warrant. Warrant in police hands, the Court's practical problems disappear.

---

[2] Remarkably, the Court thinks my disagreement with its account of the applicable social norms distances me from *Randolph*'s understanding of social expectations. See *ante,* at 11–12, n. 5. Quite the opposite. *Randolph* considered whether "customary social understanding accords the consenting tenant authority powerful enough to prevail over the cotenant's objection"; social practice in such circumstances, the Court held, provided no cause to depart from the "'centuries-old principle of respect for privacy of the home.'" 547 U. S., at 115, 121 (quoting *Wilson* v. *Layne*, 526 U. S. 603, 610 (1999)). See also 547 U. S., at 115 ("Disputed permission is . . . no match for this central value of the Fourth Amendment . . . ."). I would so hold here. Today's decision, by contrast, provides police with ready means to nullify a cotenant's objection, and therefore "fails to come to grips with the reasoning of [*Randolph*]." *Ante,* at 12, n. 5.

Indeed, as the Court acknowledges, see *ante*, at 13–14, reading *Randolph* to require continuous physical presence poses administrative difficulties of its own. Does an occupant's refusal to consent lose force as soon as she absents herself from the doorstep, even if only for a moment? Are the police free to enter the instant after the objector leaves the door to retire for a nap, answer the phone, use the bathroom, or speak to another officer outside? See Brief for Petitioner 28. Hypothesized practical considerations, in short, provide no cause for today's drastic reduction of *Randolph*'s holding and attendant disregard for the warrant requirement.

## II

In its zeal to diminish *Randolph*, today's decision overlooks the warrant requirement's venerable role as the "bulwark of Fourth Amendment protection." *Franks* v. *Delaware*, 438 U. S. 154, 164 (1978). Reducing *Randolph* to a "narrow exception," the Court declares the main rule to be that "consent by one resident of jointly occupied premises is generally sufficient to justify a warrantless search." *Ante,* at 7. That declaration has it backwards, for consent searches themselves are a "'jealously and carefully drawn' exception" to "the Fourth Amendment rule ordinarily prohibiting the warrantless entry of a person's house as unreasonable *per se*." *Randolph*, 547 U. S., at 109 (quoting *Jones* v. *United States*, 357 U. S. 493, 499 (1958)). See also *Jardines*, 569 U. S., at ___ (slip op., at 4) ("[W]hen it comes to the Fourth Amendment, the home is first among equals. At the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'"); *Payton* v. *New York*, 445 U. S. 573, 585 (1980) ("[T]he physical entry of the home is the chief evil against which . . . the Fourth Amendment is directed." (internal quota-

tion marks omitted)).[3]

In this case, the police could readily have obtained a warrant to search the shared residence.[4] The Court does

———————

[3] I agree with the Court that when a sole owner or occupant consents to a search, the police can enter without obtaining a warrant. See *ante,* at 5–6. Where multiple persons occupy the premises, it is true, this Court has upheld warrantless home searches based on one tenant's consent; those cases, however, did not involve, as this case does, an occupant who told the police they could not enter. See *United States* v. *Matlock*, 415 U. S. 164 (1974) (police relied on cotenant's consent to search when other tenant had already been detained in a nearby squad car); *Illinois* v. *Rodriguez*, 497 U. S. 177 (1990) (same, when the other tenant was asleep in the bedroom). The Court's rationale for allowing a search to proceed in those instances—that co-occupants "assum[e] the risk that one of their number might permit the common area to be searched," *Matlock*, 415 U. S., at 171, n. 7—does not apply where, as here, an occupant on the premises explicitly tells the police they cannot search his home *sans* warrant. See *United States* v. *Henderson*, 536 F. 3d 776, 788 (CA7 2008) (Rovner, J., dissenting) (in such circumstances, the objector "has not assumed the risk that his co-tenant may subsequently admit the visitor, because all choice has been taken from him in his involuntary removal from the premises").

[4] The Court dismisses as "beside the point" the undeniable fact that the police easily could have obtained a warrant. *Ante,* at 6, n. 4. There may be circumstances, the Court observes, in which the police, faced with a cotenant's objection, will lack probable cause to obtain a warrant. That same argument was considered and rejected by the Court in *Randolph*, which recognized that "alternatives to disputed consent will not always open the door to search for evidence that the police suspect is inside." 547 U. S., at 120. Moreover, it is unlikely that police, possessing an objective basis to arrest an objecting tenant, will nevertheless lack probable cause to obtain a search warrant. Probable cause to arrest, I recognize, calls for a showing discrete from the showing needed to establish probable cause to search a home. But "where, as here, a suspect is arrested at or near his residence, it will often 'be permissible to infer that the instrumentalities and fruits of th[e] crime are presently in that person's residence.'" Brief for National Association of Criminal Defense Lawyers as *Amicus Curiae* 25 (quoting 2 W. LaFave, Search and Seizure §3.1(b) (5th ed. 2011)). And as the Court observed in *Randolph*, if a warrant may be impeded by a tenant's refusal to consent, "[a] co-tenant acting on [her] own initiative may be able to deliver evidence to the police, and . . . tell the police what [s]he

not dispute this, but instead disparages the warrant re-
quirement as inconvenient, burdensome, entailing delay
"[e]ven with modern technological advances." *Ante,* at 14.
Shut from the Court's sight is the ease and speed with
which search warrants nowadays can be obtained. See
*Missouri* v. *McNeely*, 569 U. S. ___, ___ (2013) (slip op., at
11) (observing that technology now "allow[s] for the more
expeditious processing of warrant applications," and citing
state statutes permitting warrants to be obtained "remotely
through various means, including telephonic or radio
communication, electronic communication . . . , and video
conferencing"). See also Brief for National Association of
Criminal Defense Lawyers as *Amicus Curiae* 29 (describ-
ing California's procedures for electronic warrant applica-
tions). With these developments in view, dilution of the
warrant requirement should be vigilantly resisted.

   Although the police have probable cause and could
obtain a warrant with dispatch, if they can gain the con-
sent of someone other than the suspect, why should the
law insist on the formality of a warrant? Because the
Framers saw the neutral magistrate as an essential part
of the criminal process shielding all of us, good or bad,
saint or sinner, from unchecked police activity. See, *e.g.,*
*Johnson* v. *United States*, 333 U. S. 10, 13–14 (1948) ("The
point of the Fourth Amendment . . . is not that it denies
law enforcement the support of the usual inferences which
reasonable men draw from evidence. Its protection con-
sists in requiring that those inferences be drawn by a
neutral and detached magistrate instead of being judged
by the officer engaged in the often competitive enterprise
of ferreting out crime."). "The investigation of crime," of
course, "would always be simplified if warrants were
unnecessary." *Mincey* v. *Arizona*, 437 U. S. 385, 393

————————

knows, for use before a magistrate in getting a warrant." 547 U. S., at
116 (citation omitted).

(1978). "But the Fourth Amendment," the Court has long recognized, "reflects the view of those who wrote the Bill of Rights that the privacy of a person's home and property may not be totally sacrificed in the name of maximum simplicity in enforcement of the criminal law." *Ibid.* See also *Randolph*, 547 U. S., at 115, n. 5 ("A generalized interest in expedient law enforcement cannot, without more, justify a warrantless search.").

A final word is in order about the Court's reference to Rojas' autonomy, which, in its view, is best served by allowing her consent to trump an abusive cohabitant's objection. See *ante,* at 15 ("Denying someone in Rojas' position the right to allow the police to enter *her* home would also show disrespect for her independence.").[5] Rojas' situation is not distinguishable from Janet Randolph's in this regard. If a person's health and safety are threatened by a domestic abuser, exigent circumstances would justify immediate removal of the abuser from the

_____

[5] Although the validity of Rojas' consent is not before us, the record offers cause to doubt that her agreement to the search was, in fact, an unpressured exercise of self-determination. At the evidentiary hearing on Fernandez' motion to suppress, Rojas testified that the police, upon returning to the residence about an hour after Fernandez' arrest, began questioning her four-year-old son without her permission. App. 81, 93. Rojas asked to remain present during that questioning, but the police officer told her that their investigation was "going to determine whether or not we take your kids from you right now or not." *Id.,* at 93. See also *ibid.* ("I felt like [the police] were going to take my kids away from me."). Rojas thus maintained that she felt "pressured" into giving consent. *Id.,* at 93–94. See also *id.,* at 93 ("I felt like I had no rights."). After about 20 or 30 minutes, Rojas acceded to the officer's request that she sign a consent form. Rojas testified that she "didn't want to sign [the form]," but did so because she "just wanted it to just end." *Id.,* at 100.

The trial court found Rojas' testimony at the suppression hearing "believable at points and unbelievable at other points," and concluded that the police conduct did not amount to "duress or coercion." *Id.*, at 152. The trial court agreed, however, that Rojas "may have felt pressured." *Ibid.*

premises, as happened here. Cf. *Randolph*, 547 U. S., at 118 ("[T]his case has no bearing on the capacity of the police to protect domestic victims. . . . No question has been raised, or reasonably could be, about the authority of the police to enter a dwelling to protect a resident from domestic violence . . . ."). See also *Brigham City* v. *Stuart*, 547 U. S. 398, 403 (2006) ("[L]aw enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury."). Domestic abuse is indeed "a serious problem in the United States," *Randolph*, 547 U. S., at 117 (citing statistics); appropriate policy responses to this scourge may include fostering effective counseling, providing public information about, and ready access to, protective orders, and enforcing such orders diligently.[6] As the Court understood in *Randolph*, however, the specter of domestic abuse hardly necessitates the diminution of the Fourth Amendment rights at stake here.

\*    \*    \*

For the reasons stated, I would honor the Fourth Amendment's warrant requirement and hold that Fernandez' objection to the search did not become null upon his arrest and removal from the scene. "There is every reason to conclude that securing a warrant was entirely feasible in this case, and no reason to contract the Fourth Amendment's dominion." *Kentucky* v. *King*, 563 U. S. \_\_\_, \_\_\_ (2011) (GINSBURG, J., dissenting) (slip op., at 5). I would

––––––––––

[6] See generally National Council of Juvenile and Family Court Judges, Civil Protection Orders: A Guide for Improving Practice (2010), online at http://www.ncjfcj.org/sites/default/files/cpo_guide.pdf (all Internet materials as visited Feb. 21, 2014, and available in Clerk of Court's case file); Epidemiology and Prevention for Injury Control Branch, California Statewide Policy Recommendations for the Prevention of Violence Against Women (2006), online at http://www.cdph.ca.gov/programs/Documents/VAWSPP-EPIC.pdf.

GINSBURG, J., dissenting

therefore reverse the judgment of the California Court of
Appeal.